51 CCPA

**Clinton W. MacMULLEN and Alfred Marzocchi, Appellants,**

v.

**Thomas R. SANTELLI, Appellee.**

**Thomas R. SANTELLI, Appellant,**

v.

**Clinton W. MacMULLEN and Alfred Marzocchi, Appellees.**

Patent Appeal Nos. 7035, 7026.

United States Court of Customs and Patent Appeals.

Feb. 6, 1964.

---

Henry W. Foulds, Jr., New York City (R. T. McLean, New York City, and Martin J. Brown, Washington, D. C., of counsel), for parties MacMullen and Marzocchi.

Carrol Palmer, Washington, D. C. (Robert M. Krone, Chicago, Ill., of counsel), for party Santelli.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

These appeals are from the decision of the Board of Patent Interferences in Interference No. 89,543. The board awarded priority as to three counts to the party MacMullen et al. and the remaining counts to the party Santelli. Both parties appeal.

MacMullen et al. were issued a patent[1] from which Santelli copied nine claims in his pending application.[2] These claims constitute the counts in issue here. Santelli is the senior party by virtue of the earlier filing date of his application, but the board found that MacMullen et al. could rely on their parent application,[3] which had an earlier filing date than the Santelli application, to support counts 2, 4 and 8. Priority was awarded on the basis of the filing dates of the applications, rather than on the basis of testimony, although MacMullen et al. took testimony.

The issue in No. 7035 is whether the testimony of MacMullen et al. is sufficient to establish a reduction to practice before the filing date of Santelli.

The issue in No. 7036 is whether the parent MacMullen et al. application establishes a constructive reduction to practice of the invention of counts 2, 4 and 8 before the Santelli filing date.

The invention relates to a method of coating glass surfaces, more particularly glass fibers, and the organosilicon coating compositions used. Hydrocarbon-substituted trihalosilanes are hydrolyzed in aqueous alkali and then acidified to a pH of 2 to 6 to form stable solutions of the alkaline hydrolysis products of the organotrihalosilanes. The stable solution is applied to a glass surface and a coating of insoluble organosilicon compound is deposited. Subsequent heating cures the coating by polymerizing the organosilicon compound.

It appears that the organosilicon composition is unstable at a pH in the range of 9 to 11. The word "unstable" describes a solution in which the dissolved siliconate precipitates into solid particles which fall to the bottom of the container. To avoid much precipitation at the unstable range when lowering the pH of a solution from strongly alkaline (pH 13), at which the material is stable, to the stable acid range (pH 2–6), the acidification is carried out rapidly. In addition, the unstable range of pH 9 to 11 is avoided by adding the alkaline material to the acid neutralizer. Count 5 specifies that the pH is reduced by "adding said hydrolysis products to an aqueous acid." If the acid is added to the alkaline hydrolysis products, the composition will

---

1. No. 2,723,211 issued November 8, 1955 on application Serial No. 348,552, filed April 13, 1953.

2. Serial No. 279,695, filed March 31, 1952.

3. Serial No. 119,569, filed October 4, 1949.

have to pass through the unstable range of pH 9 to 11, at which time some precipitation will occur, the amount depending on the rapidity of the acidification. The counts containing the express limitation of a method of "rapidly reducing the pH" were awarded to Santelli, and those without the limitation were awarded to MacMullen et al. In addition, two counts are drawn to a stable composition: one "having a pH of from 2–6" and the other "having a pH of about 4." The more narrowly defined count was awarded to Santelli. Since the parent MacMullen et al. application disclosed a composition at pH 6, the broader composition count was awarded to MacMullen et al.

Counts 1 and 8 are representative and read:

"1. The method of treating a glass surface to produce a coating of insoluble organosilicon compounds thereon which comprises preparing an aqueous alkaline solution of the hydrolysis products of a hydrocarbon-substituted trihalosilane, rapidly reducing the pH of said solution to a value between 2 and 6 to produce a stable acidic solution of said hydrolysis products, applying said acidic solution to said glass surface to cause a coating of insoluble organosilicon compounds to be deposited on said surface, and curing said coating at an elevated temperature below the softening point of said glass to complete polymerization of said compounds.

"8. A composition for treating materials to render them water-repellent, said composition being a stable aqueous sol of hydrocarbon substituted silane triol having a pH of from 2–6."

Considering first the testimony involved in No. 7035, appellants pose three questions to be resolved:

1. Whether certain experiments performed by Titus on July 12 to July 14, 1950 in Syracuse, New York, were an actual reduction to practice of counts 8 and 9.

2. Whether a trial run performed by Meyer and Marzocchi on August 8, 1950 at Huntingdon, Pennsylvania was an actual reduction to practice of counts 1, 2, 3, 4 and 8.

3. Whether a plant run performed at Ashton, Rhode Island on April 10, 1951 was an actual reduction to practice of all the counts.

As to the first question, Titus was a research chemist employed by Cowles Detergent Company who reported to Marzocchi, one of the appellants. In July 12–14, 1950, Titus carried out a series of tests which he entitled in his notebook "Determination of the Stability of 1% Solutions of Vinyl Sodium Siliconate of Various pH's." [4] The tests "indicate that a pH of 3, 4 or 5 of the material is quite stable over a reasonably long period of time."

The board refused to consider these tests as an actual reduction to practice of the composition counts because "these two counts recite a water repellent utility which Titus did not establish." There was no question, however, that the compositions were found to be stable and met the counts but for the recitation in the preamble of the ultimate utility of the aqueous compositions. Titus testified that during the period of his work with siliconates the goal was water repellency. He testified:

" * * * In the beginning we began to work with metals, hoping to put films on them. It didn't work, so we rejected that. Then came paper and cloth, to try to get a water repellency. That didn't work well enough to bother with, so we didn't bother with it anymore. Finally we got started to work on glass cloth, and we put all our efforts on it."

The record fails to show any tests for water repellency with the stable compo-

4. The terms "vinyl sodium siliconate," "vinyl siloxanolate" and "vinyl siliconate" appear to be used interchangeably in the record to designate the alkaline hydrolysis products of vinyl trichlorosilane.

sitions by Titus. A test conducted by Titus three days after the stability tests showed a "lack of water repellency" using a somewhat different vinyl siliconate at pH 7. Santelli contends that the Titus testimony shows that the stability tests on which MacMullen et al. rely for a reduction to practice of counts 8 and 9 were not considered at that time sufficient to conclude that pH 4 was the optimum for stability of the solutions. Further stability tests were developed and the July 12–14 tests were followed by later tests to further establish the facts concerning optimum pH for stability.

MacMullen et al. argue that it was unnecessary to establish a water repellency utility for the compositions because it was "a matter of common knowledge at the time [that] silicone materials were useful for rendering materials water repellent."

MacMullen et al. further rely on a letter from L. P. Biefeld to Marzocchi, dated May 11, 1950, as showing that the compositions were water repellent. We note that this letter relates to tests at pH 7, which is outside the scope of counts 8 and 9, and therefore cannot be considered to attribute a water repellency property to the solutions tested July 12–14, 1950.

As it will appear from the view we take of the case, it is unnecessary to decide whether the July 12–14, 1950 tests by Titus constitute a reduction to practice of counts 8 and 9.

As to the trial run at Huntingdon, Pennsylvania on August 8, 1950, the board found no actual reduction to practice.

In this run, a large batch of a material identified as SS–2D was prepared by Titus on August 1, 1950 "for test at O Corning-Fiberglas Corp." On August 8, Meyer, an employee of Owens-Corning Fiberglas Corporation,[5] noted that "SS–2D (vinyl derivative of siloxanolate) was employed as the starting material in the run." The board found "no corroboration of Marzocchi's testimony that the

Titus batch was used in the test." The board also found the pH of the treating bath was not always within the range of the counts, but "a more serious objection to holding that this run is an actual reduction to practice of counts 1, 2, 3, 4 and 8" was the lack of conviction of success. Meyer testified that Marzocchi had "a question in his mind that we had really made a good finish." Meyer's report stated "The cloth was fairly stiff" and mechanical difficulties were encountered, but "exceptionally high impact strengths" were obtained and "wet flexure strengths" were "far superior to the control panels." Marzocchi's report of the run stated it was "a very poor indication of the applicability of Cowles SS–2D to this material." The board said:

> " * * * If Marzocchi did not consider the test successful, this Board cannot be called upon, at a later date, to give this test a status which the inventor did not attribute to it at that time; Smith v. Nevin, 22 CCPA 748, 73 F.2d 940, 452 OG 469, 23 USPQ 353, 357."

Again, under the view we take of the case, it is unnecessary to decide whether the August 8, 1950 run at Huntingdon was, per se, an actual reduction to practice.

On April 10, 1951, another run was made at Ashton, R. I. MacMullen et al. claim that this plant run was a reduction to practice of the subject matter of all of the counts.

This run was carried out in what is termed a "coronizing unit." The report of Gagnon, an OCF employee who was present, states that a 128-yard cut of cloth was "heat cleaned at 1200° F. and went directly into the pad box containing the SS–2D solution." Pad rolls then squeezed off excess solution and the cloth was run into a drying oven at 250° F. The solution was made by adding 5 gallons of "Cowles SS–2D" to diluted muriatic Acid. The pH was adjusted to 4 with sodium hydroxide. The report

---

5. Hereinafter referred to as OCF.

states that "due to faulty pH readings, the bath precipitated." Apparently another 5 gallons of SS–2D was used to make a new batch with the result that the "entire run was very successful." The report pointed out that the critical pH of 10 is a "difficulty" which would be overcome "with ample education and some experience" and that there was a "possibility" of other problems. The board did not question the conviction of success of this run, but found no corroborating proof of how the SS–2D "originated and how it reached OCF at Ashton." The board said:

> " * * * not one witness testified to how the particular sample asserted to be Cowles SS–2D and used in the April 10, 1951 Ashton trial, came to Ashton and how he knew that material to be what he said it was. Stated another way, despite the voluminous record, there is absent the corroboration required by law that the sample used in that test was in fact that stated to be the alkaline hydrolysis product of vinyl trichlorsilane of Cowles SS–2D * * *."

MacMullen et al. refer to the report of Frazer, an employee in charge of the plant control laboratory at the Cowles' Lockport, New York plant which describes the preparation of a large batch of Cowles SS–2D on March 29, 1951. The report states: "285 lb. net of filtered batch shipped in 30 gal. plain steel drum 3/30/51 by truck to Owens-Corning Fiberglas, Ashton, R. I."

Santelli contends that "Cowles SS–2D" varied in composition and method of preparation and that no one could testify as to the chemical composition used at Ashton. For support, Santelli relies on some calculations placed of record by MacMullen et al. indicating that the "Old Formula 7/19/51" included 10 moles of sodium hydroxide per mole of vinyl trichlorosilane and the "New Formula 11/1/51" reduced the ratio to 8 to 1.

Santelli also argues that "there was still doubt that the operations at Ashton were successful for their intended purpose." As to counts 8 and 9, Santelli argues that no tests of water repellency were made in the April 10th operations.

We are of the opinion that the run at Ashton, R. I. on April 10, 1951 constitutes an actual reduction to practice. There is nothing in the record to indicate that the term "SS–2D" was ever used to designate anything except alkaline hydrolysis products of vinyl trichlorosilane. On the other hand, there are many, many instances in the record showing SS–2D as the alkaline hydrolysis products of vinyl trichlorosilane. The fact that the amount of alkali employed was changed at least once does not alter the chemical composition or formula of the hydrolysis products in any material respect. The counts clearly do not define any precise amounts of alkali. We find no merit in the contention of Santelli that the composition of SS–2D varied. Whatever variations were made, the record indicates that every batch of Cowles SS–2D contained a "hydrocarbon-substituted silane triol" as defined in the counts. The pH and stability may have varied, but SS–2D was always a hydrocarbon-substituted silane triol.

The reports of the run at Ashton show that the properties of the SS–2D used were the same as the properties of SS–2D made at other times. The Gagnon report shows that the optimum pH of 4, as defined in the counts, was employed during the run; that pH10 was critical and must be avoided to prevent precipitation; that precipitation did occur "due to faulty pH readings"; that "the SS–2D was added to the acid solution" just as count 5 requires; and that the SS–2D was "alkaline." We find nothing in the record to indicate that SS–2D was not the vinyl siliconate which several witnesses testified that it was. The board admitted that "Meyer testified that he knew Cowles' SS–2D to be a vinyl derivative of siloxanolate," and thus within the alkaline hydrolysis products used in the method of the counts, but it found no proof that the Cowles' SS–2D used at Ashton was in fact such a material. There is no basis for assuming that it was not. The

fact that a shorthand description of the material was used is no reason to believe that SS–2D somehow changed from the composition consistently made under that designation. The witness Titus testified that "SS" stands for "soluble siliconate" and the number stands for the number of carbon atoms in the compound. This definition indicates that *all* "SS-number" compositions met the language of the composition counts 8 and 9 of "hydro-carbon-substituted silane triol." Even if it be assumed that Meyer obtained his knowledge of the composition through Marzocchi, an inventor, the corroboration of Frazer and Titus indicates that SS–2D means the alkaline hydrolysis product of vinyl trichlorosilane.

While the Gagnon report does not show that the final product was tested for water repellency, this is not necessary for a reduction to practice of counts 8 and 9. Even though the preamble of counts 8 and 9 suggests the ultimate purpose of the composition is water repellency, it is clear that the aqueous compositions themselves are not water-repellent. The Gagnon report shows utility as a fabric finish since "the entire run was very unsuccessful" with SS–2D "as a substitute for the present 114 Finish." Finish 114 is shown by the record to contain a chromium complex for the purpose of improving the properties of the cloth, including water repellency. The tests for water absorption, wet flexural strength and contact angle appear to be tests of water repellency. The record shows numerous favorable comparisons between hydrocarbon-substituted silane triols and the previously used water-repellent finishing material. The report of Bacon, Manager of the Reinforced Plastic Section of the Products Development Laboratory at OCF at the time, indicates a realization that "a water system of * * * SS–2D" is useful because of good wet strength retention.

■■ No one testified that the SS–2D used at Ashton came from any particular source. It seems likely that the batch prepared by Frazer on March 29, 1951 and sent to Ashton on March 30, 1951 was the material used on April 10, 1951. So far as the record shows, the only batch large enough to provide the ten gallons of SS–2D used at Ashton (the first 5 gallons precipitated, requiring a new mix) within several months of the date of the Ashton run, was the batch prepared by Frazer on March 29. However, even if the Frazer batch of March 29 was not the SS–2D used, we are convinced that the Marzocchi testimony that SS–2D made according to the method of the counts was used at Ashton has been corroborated. There is no fixed single formula in proving corroboration. Phillips et al. v. Carlson, 278 F.2d 732, 47 CCPA 1007. The record does not show that SS–2D ever varied from "hydrocarbon-substituted silane triol" or "an aqueous alkaline solution of the hydrolysis products of a hydrocarbon-substituted trihalosilane," as called for in the counts. Titus tested SS–2D at the pH designated in the counts and determined the stability. The Huntingdon run illustrated the superior flexural strength and the properties of the product made by the method of the counts. The report of corroborating witness Gagnon shows that the method steps of the counts were used at Ashton with SS–2D. Considering the record as a whole, we are persuaded that Mac-Mullen et al. actually reduced to practice the method of counts 1 to 7 with the composition of counts 8 and 9 by the time of the Ashton run on April 10.

Since we find that MacMullen et al. actually reduced the invention to practice before the Santelli filing date, it is unnecessary to decide whether the invention of counts 2, 4 and 8 was constructively reduced to practice in the parent application of MacMullen et al. The affirmance of the decision of the board in No. 7036 is a result of our view of the testimony, and is not based on a consideration of the parent application.

For the foregoing reasons, the decision of the board in No. 7035 is reversed and the decision in No. 7036 is affirmed.

Modified.