52 CCPA

**James A. PATTERSON and Glenn K. Lissner, Appellants,**

v.

**Karl-Heinz HAUCK, Appellee.**

**Patent Appeal No. 7262.**

United States Court of Customs and Patent Appeals.

Feb. 18, 1965.

Stanley Bialos, San Francisco, Cal., Warburton & Cross, Dick M. Warburton, Painesville, Ohio (Harold I. Johnson, San Francisco, Cal., of counsel), for appellants.

Burgess, Dinklage & Sprung, New York City (Arnold Sprung, New York City, of counsel), for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

RICH, Judge.

This appeal is from the decision of the Board of Patent Interferences, adhered to on reconsideration, awarding priority to Hauck.

Hauck is involved on the basis of his application, serial No. 554,133, filed December 20, 1955. On a motion to shift the burden of proof he was given the benefit of the filing date of a German convention application, December 23, 1954, as the result of which he became senior party.

Patterson and Lissner are the present applicants of an application, serial No. 520,137, filed July 5, 1955, by Patterson and Abrams. The interference, No. 89,-824, was originally declared November 14, 1958, on that application but was reformed on May 12, 1959, upon the changing of the joint applicants from Patterson and Abrams to Patterson and Lissner.

Hauck, relying solely on his German filing date, took no testimony. Patterson et al. gave testimony themselves and called five other witnesses in corroboration thereof. They also put in evidence several documentary exhibits. They assert actual reduction to practice of the invention prior to Hauck's filing date of December 23, 1954.

The board reviewed Hauck's right to rely on his German filing date and found no error in the examiner's ruling that he was entitled to it, finding that the German application contained clear support for each positive limitation of the count in issue. Upon a review of the evidence of the junior party it concluded that there was a failure to establish an actual reduction to practice prior to December 23, 1954. The board also ruled that Patterson et al. could not overcome Hauck's date by a showing of conception prior to December 23, 1954, coupled by diligence extending from a time just prior to December 23, 1954, to a later reduction to practice. The board also considered Hauck's contention, repeated in this court, that the conversion of the inventorship in appellants' application was not in compliance with the statute, 35 U.S.C. § 116, by reason of which appellants do not have a valid application on which an award of priority to them can be made. This issue had previously been taken to the Commissioner on petition, the First Assistant Commissioner ruling that it should be passed on by the board either as (a) a matter ancillary to priority or (b) one suitable for a recommendation under Rule 259 of the Rules of Practice. The board found compliance with the statute and a legal change of inventorship. All of these issues are raised on this appeal.

To summarize, there are four possible issues: (1) Whether Hauck is entitled to his German filing date; (2) whether Patterson et al. had an actual reduction to practice before that date; (3) whether the latter were diligent during a period of about six months; and (4) whether the inventorship of the Patterson et al. application was illegally changed.

### Invention of the Count

At the times here involved Patterson and Lissner, as well as most of their witnesses, were employed by Chemical Process Company, now a division of Diamond Alkali Company, in Redwood City, California. Part of this company's business was the manufacture and sale of "polyester resins," sold under the name "Duo-lite." These are liquid resins or "plastics" capable of being turned into tough solids by the action of catalysts. According to Lissner, and other witnesses, his company's "polyesters" were solutions of unsaturated polyesters in a polymerizable monomer, usually styrene, and the polyester itself was a condensation product of polycarboxylic acids and glycols. These polyesters were liquid products shipped to customers in drums and, as sold, might contain accelerators or inhibitors. Users of this material would mix it with a suitable cataylst, coat it on a reinforcing or laminating materal such as glass cloth or glass fiber mat material and allow it to harden. By placing the reinforcement over a form, objects of any desired shape could be produced such as flat or corrugated panels, boats, gear cases for aircraft, amusement park devices, cabs for earth moving equipment, protective "hard hats," or lamp shades, these all being objects actually made by Chemical Process Company customers.

An inherent difficulty in the use of the polyester resins was that as soon as the catalyst was added to the liquid resin it would begin to polymerize or set, first to a gel and then to hard material. It therefore had a "pot life," after which it would be of no further use, which might range from a few minutes to several hours depending on type and amount of catalyst mixed into it. A long pot life, which might be convenient in extending time available for fabrication, entailed the further disadvantage that vertical coated surfaces might not set rapidly enough to prevent running off of the fluid coating before it gelled.

The invention is a relatively simple variation in the *process* of using these known polyester materials wherein the cataylst is not mixed with the polyester *before* it is applied to the glass or other reinforcement but is separately coated on the reinforcement in a lacquer solution, the lacquer containing a volatile solvent which is allowed to evaporate, leaving the catalyst bound to the layer of material to be coated with the polyester. When the polyester is applied to the thus pre-

pared surface, it comes into contact with the catalyst for the first time and only then begins to polymerize and harden. Thus the pot life of the coating material is indefinitely extended, quick hardening after coating can be achieved, and the principal disadvantages of the former process are eliminated. The process of the invention may clearly be discerned in the single count, which reads:

"Process for coating surfaces with unsaturated polyesters which comprises coating the surface with a solvent containing lacquer capable of drying by solvent evaporation and containing a peroxide catalyst capable of hardening a solution containing an unsaturated polyester dissolved in a polymerizable monomer, evaporating the solvent from said layer, thereafter applying a coating of an unsaturated polyester dissolved in a polymerizable monomer and allowing said coating to set by action of said catalyst."

### Hauck's Date

We shall consider first the date of invention to which Hauck is entitled. The examiner, granting a motion by Hauck to shift the burden of proof, held him entitled to the filing date of his German patent application under 35 U.S.C. § 119. Patterson et al. seek to deprive him of this date on the ground that the disclosure of the German application is insufficient to support the count, judged by the standards of 35 U.S.C. § 112. Appellants point out that Hauck's United States application contains a quantity of specific illustrative material not present in the German application. Notwithstanding this difference, the examiner made the following finding:

"The German application of Hauck specifically defines the surface to be coated, the particular peroxide catalyst and solvent therefore [sic], the lacquer, the ratio of peroxide solution to lacquer, a type of polyester resin monomer solution contemplated and the steps of application and drying. The disclosure is clearly

sufficient to teach one skilled in the art how to practice the invention without undue experimentation. Also it is seen that the best mode of carrying out the invention is set forth."

The examiner also ruled, in reply to argument by Patterson et al., that

"The provisions of Rule 71(b) are within 35 U.S.C. 112 which requires the inventor to set forth the best mode of carrying out his invention. It does not require that the specification be filled with examples but that the disclosure be measured by its adequacy to teach those skilled in the art how to practice the invention without requiring undue experimentation."

The board found no error in the conclusion of the examiner and neither do we. Giving the German application, in the words of section 119, "the same effect as the same application would have if filed in this country," we find Hauck entitled to the December 23, 1954 date. Patterson et al. claim to have made an actual reduction to practice earlier than that date and we turn now to that issue.

### Actual Reduction to Practice by Patterson et al.

Drawing what we deem to be unduly rigid principles of law primarily from the case of Thurston v. Wulff, 164 F.2d 612, 35 CCPA 794, and applying them to the facts, the board concluded that no actual reduction to practice had been proved. On a review of *all* the evidence, and considering it as a whole, we do not have the slightest doubt that the invention was reduced to practice several times before December 23, 1954 or that the proof thereof is legally sufficient.

Thurston v. Wulff was a case in which the appellant argued that the rule of independent corroboration of inventors' testimony or notebook evidence was a harsh one and "should not be applied with its usual strictness in chemical cases where new compounds emanate from large and well-conducted laboratories in the ordinary course of business

* * *." This court flatly rejected that proposition but said, in doing so:

> "An inventor's testimony, however, might be corroborated *by facts and circumstances other than by an independent witness*. Such proof or evidence should be independent of the testimony of the inventor and should not consist of self-serving documents prepared by him or under his direction, nor should it be based upon facts the truth of which *depends* upon information received from the inventor." [Emphasis added.]

In that case, we note, the issue before the court was the identity of a compound alleged to be γ-nitropimelic nitrile, that being the subject matter of the count. The alleged corroborating evidence apparently failed, technically, to establish the *identity* of the material which was physically in evidence, as of a date earlier than the critical date. We are not faced with such a situation in this case, which involves the question of whether a simple *process*, using *known* materials, was or was not practiced.

On other occasions we have been faced with similar applications of Thurston v. Wulff, as we were recently in Hasselstrom v. McKusick, 324 F.2d 1013, 51 CCPA 1008, wherein we reversed a finding of no corroboration and said:

> " * * * we are in complete agreement with the necessity for corroboration of an inventor's testimony. However, the purpose of corroborative evidence is to confirm and to strengthen the testimony of the inventor. [Quoting in a footnote Rivise and Caesar, Interference Law and Practice, Vol. 3, p. 2127.] Obviously the amount and quality of corroborative evidence that is necessary in any given case will vary with the facts of that case. As we observed in Phillips and Paul S. Starcher v. Arthur W. Carlson, 278 F.2d 732, 47 CCPA 1007 there can be no fixed single formula in determining the sufficiency of corroborative evidence."

We repeated the last statement in MacMullen v. Santelli, 326 F.2d 1008, 51 CCPA 978. In Guinot v. Hull, 204 F.2d 281, 40 CCPA 982, to the same effect, we said:

> "A study of the cases issuing from this court reflect[s] the consistent application of the doctrine of independent corroboration of the inventor; that each case is decided upon the basis of the facts therein; and that the entire record is examined to determine whether the necessary proof is present in a given case."

In Gianladis v. Kass, 324 F.2d 322, 51 CCPA 753, we said:

> "As we understand the board's position, corroboration of the Gianladis reduction to practice would require that Packwood have tested the composition cosmetically and know of his *own independent* knowledge the chemical constituents thereof. We do not agree.
>
> "This court stated in Phillips and Starcher v. Carlson * * * [cited supra]:
>
> > " 'While each and every element of a reduction to practice must be corroborated, there is no fixed single formula in proving corroboration. It may be established by documentary evidence and the activity of others * * *.'
>
> "The goal of corroboration here is simply to establish that the inventor actually produced the product and knew it would work, by proof that could not have been fabricated or falsified. All the evidence must be considered in determining whether or not the appellant has met such requirement."

The *foregoing cases present no novel doctrine*. In Buffington v. Blair, 121 F.2d 635, 28 CCPA 1382, this court said:

> "The record must be considered as a whole, and all competent testimony making up the continuous story given its proper place and weight."

The continuous story here begins on 10 June 1954, the date of three notebook

pages of one of the inventors, Lissner, recording what is said to be the first reduction to practice. These pages were signed and dated by Lissner, signed and dated by the other inventor Patterson and the first page is signed and dated by Leo L. Benezra, a group leader for polyester research in the laboratory where Lissner worked, a small laboratory of 8 or 10 men working closely together. What they show, taken with Lissner's testimony, is the preparation of a solution of methylene chloride as solvent, benzoyl peroxide catalyst, and a low molecular weight polystyrene as binder (all constituting a "lacquer"), the coating of a sandwich of cloth-mat-cloth of glass fibers therewith; drying by loss of solvent, leaving the sandwich slightly stiff; impregnating the thus treated glass material with one of the regular polyester materials of the Chemical Process Company, known as "364CSA," containing a small amount of dimethylaniline as an activator for the peroxide catalyst; and gelling of the coating in about 5 minutes, complete curing being accomplished by heating at 65° C. for half an hour. Now, to be sure, this is the testimony and the showing of the written records of one of the coinventors himself and standing *alone* would be insufficient. The problem of corroboration is simply whether there is other evidence which makes it appear that these events actually took place at the time shown by the records. We think there is.

There is a considerable quantity of other evidence as to events preceding those just outlined, events substantially contemporaneous therewith, and events following immediately thereafter which, in our judgment, more than adequately establish a reduction to practice on 10 June 1954. We will first refer to the testimony of Richard W. Dorst, which the board dismissed in toto along with the testimony of two other corroborating witnesses merely on the ground that they "offered no testimony concerning the *observation of acts* which could constitute actual reduction to practice * * *." (Our emphasis.) We think this is too narrow a view of the nature of corroborating evidence. It is tantamount to a requirement that corroboration requires every inventor to have a technically qualified observer at his side during every phase of the completion of an invention through actual reduction to practice, scarcely a workable or practicable rule of evidence.

The witness Dorst, 36 at the time he testified, was then president of Dorsett Marine Division of Textron, builders of "Fiberglas" boats in three plants, which boats are made of "Fiberglas" cloth, mat, and woven roving combined with unsaturated polyester resins, cured, and known as Dorsett boats. From 1951 through September 15, 1955, he was employed by Chemical Process Company, hired as new products manager and made manager of the polyester division before the events herein took place. As such, he was concerned with the sale and development of polyester products. He was a graduate engineer with chemical training and prior experience in chemical manufacturing and a graduate of the Harvard Business School. Lissner was directly under his charge and worked with him on polyester technical service. In late April and early May of 1954, as shown by correspondence dated May 4, Dorst had been working on polyester promotion with the editor of Sunset Magazine, looking for do-it-yourself outlets for polyesters. A demonstration for the editor had been arranged for May 28. Dorst testified (several answers are here run together in narrative form):

"Glenn Lissner and I went over there with some resin and catalyst and promoter and sheets of cellophane and Fiberglas and we prepared the basis for certain laminates which we did on their patio at Sunset Magazine one afternoon. I think it was the 28th of May, and we prepared maybe a dozen or more laminates which we formed into little bowls and made into corrugated shapes and in which they introduced leaves and decorative objects. We used in all of this the techniques

* * * of mixing of the catalyst with the resin before combining with the reinforcement * * *. It was a messy operation. The mixing of the components in with the resin and the introduction into the Fiberglas is a messy operation, and this demonstration in which Lissner and I both participated physically made us realize that there had to be a better way of doing this. * * * we had been thinking of the possibility of introducing the catalyst on a binder with a mat and, although we had talked about it for some time among ourselves, we had not actually done any laboratory work; but, as a result of this, particularly as a result of this demonstration which was held, I told Glenn Lissner to get something started on it so that we could see whether it was feasible or not."

Dorst then testified to having known about the 10 June 1954 laminated glass fabric panel above described and to seeing it within a matter of hours after it was made, though he did not say he watched the process. We continue with excerpts from his testimony:

" * * * we made the same general observation of the panel that we make of all of the panels that we were preparing from time to time. In this particular case we wanted to see whether or not the system worked, whether or not the resin would completely cure. * * * the accelerated resin had mixed thoroughly enough with the catalyst which had been deposited on the reinforcement to cure, even though it was not directly in contact with the reinforcing. * * * We bent it and touched it and hit it and felt it and made this type of visual test and qualitative tests as to how stiff it was and whether it was hard enough and whether it was cured enough and so on. * * * Well, we were very excited—or I was very excited about the particular panel because this was what we had hoped to get.

It was as good as a panel which would have been prepared in the conventional manner. * * * The success of this panel convinced us that the method was feasible, since this panel was in all respects that we normally used for testing at the time the equivalent of a panel that we would make under the previous method."

Mr. Dorst then had his attention directed to a later test by Lissner recorded in his notebook under date of 6 Aug. 1954, witnessed the same day by Patterson, and seen "shortly thereafter" by Dorst. Dorst said:

"I recall that particularly. Item No. 4 is the sample prepared with cyclohexanone peroxide and this was a sample that I was particularly interested in because cyclohexanone peroxide is a solid which is a room temperature curing catalyst, whereas a liquid had normally been employed, methylethyl ketone peroxide, before; and I was particularly interested in this one, since it meant that we would probably get a longer shelf life of the impregnated reinforcement with cyclohexanone which was a solid, rather than methylethyl ketone peroxide which was a liquid. I recall the sample very well. * *

[Q. Can you fix the time when you saw that sample?] Well, it was within a week after the event, within a week or ten days. We reviewed these things periodically, anywhere from two to six times a month, depending on the urgency of the matter. * * * in every respect it [Item No. 4] was comparable, equal in every physical, qualitative property that we could determine [with products made in the field]."

In our judgment, Mr. Dorst's testimony has corroborative value of a high order. It is particularly to be noted in this case that the process of the count may be, and was, carried out using exactly the same polyester resins and the same catalysts already in use and being made and sold by Chemical Process Com-

pany prior to the making of the invention as a regular part of its business. There is therefore no problem in identifying materials such as may exist in cases where the invention is a new compound. All that is involved in meeting the terms of the count here is a change in manipulative procedures and the application of the catalyst in a "lacquer" solution, which, in this context, merely means a volatile solvent containing a suitable binder for the catalyst. Moreover, there is additional corroborating evidence by witnesses other than the inventors as to what the polyesters actually were, which we consider unnecessary to discuss other than to say that they were clearly such as to meet the terms of the count. We think this is a sufficient answer to appellee's contention that the evidence identifying the materials used in the Lissner work is *all* hearsay because the corroborating witnesses only knew what was being used because Lissner told them. Realistically, with respect to Dorst's evidence, the situation is the reverse. He told Lissner to take the company's polyester material, well known to both of them, and work out a better *process* of using them, which he did.

Lissner continued his work into September of 1954, trying out variations and refinements of the process and about this time Patterson prepared a three-page preliminary write-up of the invention entitled "VINYL AND/OR CONDENSATION POLYMERIZATIONS WITH CATALYST IMPREGNATED FILLERS." There are six specific examples in this write-up, some of which clearly describe the invention and go even further, describing the results attained by practicing the invention. One example refers to tests allowing periods of a day, a week, and a month between impregnating the glass mat and cloth with catalyst-binder solution and coating it with polyester-styrene mix, the gel time being the same in all three tests. The document is not dated but the evidence makes it quite clear that it was sent to San Francisco attorneys who used it in writing to Washington attorneys on

September 20, 1954, to order a search in the Patent Office. The letter requesting the search clearly discloses the same invention as the write-up and states at its end that "A copy of the inventor's report is enclosed." Another letter dated December 7, 1954, from the San Francisco attorneys to Dr. I. M. Abrams, another witness, technical director of Chemical Process Company, stamped with a received stamp Dec. 8, 1954, reads:

> "Re: *Catalyst Impregnated Fillers*
>
> Dear Irv:
>
> In accordance with your request over the telephone, we are returning your copy of the preliminary write-up on this subject."

Dr. Abrams testified that he ordered the search made, that Patterson prepared the write-up, that he, Abrams, gave it to the attorneys, that he asked for its return because it was the only one available and he needed it to make a more complete write-up for a patent application, and that the letter had been in his files ever since. The San Francisco attorney testified and confirmed the foregoing events.

Finally, with respect to dealings with the attorneys, Dr. Abrams prepared for them a more detailed write-up of 7 closely-spaced typed pages which bears date December 28, 1954. The letter of transmittal of the write-up to the attorneys bears the same date plus the notation "(dict. 12–24–54)." The letter bears a received stamp of the attorneys Dec. 29, 1954. To be sure, these dates are all a day or more after Hauck's date but as circumstantial evidence of when the process had been reduced to practice and as the final link in the chain of evidence it is evident that the test work on which the write-up is based must have been done a considerable time prior to the preparation of the detailed write-up, which Dr. Abrams said probably took him two weeks to write.

We could review the evidence of another reduction to practice made by Pat-

terson under the direction and observation of Dr. Abrams, reported as one of the examples in the December 28 write-up, but we do not consider it necessary. We think it too undoubtedly took place prior to Hauck's date. We think Abrams' testimony thoroughly corroborated the testimony of Patterson respecting it, considered in the light of the surrounding circumstances and the nature of the invention. The board appears to have rejected the evidence on the ground that no *specific* date was fixed for the work and on the further ground that Dr. Abrams did not know of his own knowledge precisely *which* polyester was used, except as Patterson may have told him. While we appreciate the hearsay issue raised by appellee and adopted by the board, we think it has little applicability here. It happens that Patterson was doing an experiment which Dr. Abrams had told him to do to provide an added example for a patent application, using one of the company's polyesters. Other evidence shows that those polyesters are within the terms of the count. As to the lack of a *specific* date, we consider it unimportant since in all probability the *period* during which it was done was early enough to antedate Hauck.

We therefore find actual reduction to practice by Patterson and Lissner prior to the date on which Hauck relies to have been proved. This makes it unnecessary to consider the issue of diligence by Patterson et al. but does make it necessary to pass on whether their application is invalid by reason of the change in inventorship.

### Change of Inventors by Appellant

The Patterson et al. application is assigned to Chemical Process Company division of Diamond Alkali Company. It was originally filed in the names of Patterson and Abrams and was changed to one in the names of Patterson and Lissner, the Patent Office consenting. The relevant statute is the last paragraph of 35 U.S.C. § 116:

"Whenever a person is joined in an application for patent as joint inventor through error, or a joint inventor is not included in an application through error, and such error arose withhout any deceptive intention on his part, the Commissioner may permit the application to be amended accordingly, under such terms as he prescribes."

Patent Office Rule 45 implements the statute.

Hauck asserts that on the basis of the record herein there was clearly a deceptive intention in the original filing without Lissner. He presented this issue below by petition to the Commissioner who, acting through the First Assistant Commissioner, left the question to be decided by the board at final hearing as a matter ancillary to priority or one for a recommendation under Rule 259.

■ The board found compliance with section 116. It found no basis in the testimony for holding the conversion was made with deceptive intent.

■ Section 116, together with section 256 with which it should be read, was added to the law in the 1952 revision for the purpose of removing technical grounds for attacking the validity of patents by reason of the erroneous naming of inventors, on which point the prior law was very strict. As such a liberalizing provision it should be given a liberal construction in favor of applicants, permitting them to make such changes as more thorough consideration of facts may show to be necessary in order to comply accurately with the law in naming inventors. See In re Schmidt, 293 F.2d 274, 48 CCPA 1140.

Our study of the record shows no ground for overruling the well-considered decision of the board on this issue.

### Cost of Additions to Record

■ The question remains who should bear the cost of printing about 65 pages in a record of 278 pages, the added pages having been included at the request of appellee. All but 17 of the added pages relate to the proceedings below on the change of inventorship issue, an issue Hauck was entitled to raise on appeal

and to have considered in case the reduction to practice issue went against him, as it has. The remaining pages are Hauck's brief before the board. While it is usually wasteful to include briefs below in the record in this court, because the same arguments are usually made in the briefs here, the excuse is that the board's opinion refers to several pages of that brief in its opinion as setting forth Hauck's contentions. We think this is a somewhat lame reason for printing the entire brief, since an excerpt would have sufficed, but under the circumstances of the case we rule that the appellant bear the entire cost of printing the record, including all matter added by appellee.

The decision of the Board of Patent Interferences is reversed.

Reversed.