**Robert K. GRASSELLI and Robert C. Miller, Appellants,**

v.

**John DEWING and John C. Rooney, Appellees.**

**Patent Appeal No. 76–519.**

United States Court of Customs and Patent Appeals.

May 6, 1976.

Herbert D. Knudsen, Bay Village, Ohio, attorney of record, for appellants.

Paul N. Kokulis, William T. Bullinger, Cushman, Darby & Cushman, Washington, D. C., attorneys of record, for appellees.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

MARKEY, Chief Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority to senior party-appellees Dewing and Rooney[1] (Dewing) over junior party-appellants Grasselli and Miller[2] (Grasselli). We reverse.

1. Application serial No. 709,207, filed February 29, 1968, entitled "Ammoxidation of Hydrocarbons." Dewing has further been accorded the benefit of British application No. 10921/67, filed March 8, 1967, pursuant to the provisions of 35 USC 119.

### Background

The count, drafted by the examiner as a so-called phantom count under 37 CFR 1.203(a), is directed generally to a process for preparing acrylonitrile or methacrylonitrile by the catalytic ammoxidation of propane or isobutane, respectively, and reads:

A process for the production of acrylonitrile or methacrylonitrile wherein a hydrocarbon consisting essentially of propane or isobutane is reacted with ammonia and a molecular oxygen containing gas, at a temperature of 250°C to 800°C in the presence of an ammoxidation catalyst and a minor quantity of a halogen containing component wherein said ammoxidation catalyst is antimony oxide alone or in combination with at least one other metal oxide selected from the group consisting of tin oxide, titanium oxide, uranium oxide, cerium oxide, iron oxide, thorium oxide or manganese oxide and wherein the halogen component consists essentially of at least one of $Cl_2$, $Br_2$, $I_2$, an organic halide or an inorganic halide.

Only Grasselli took testimony, which was submitted in affidavit form by stipulation. It consisted of affidavits from three witnesses, coinventors Grasselli and Miller, and Maria S. Friedrich (Friedrich), an employee of the coinventors' assignee, who was relied upon as a corroborating witness.

### The Board

The board found that Grasselli's evidence of conception and reduction to practice failed to meet the limitations of the count in that neither Grasselli nor Miller specifically mentioned in their affidavit testimony the use of antimony oxide in the process they allegedly conceived and reduced to practice. More specifically, the board found that the documents attached to Grasselli's preliminary statement as Grasselli's first written description of the invention

2. Application serial No. 739,166, filed June 24, 1968, entitled "Catalytic Conversion of Saturated Hydrocarbons to Unsaturated Products by Oxidation in the Presence of a Halogen."

made "no reference to the use of antimony oxide for any purpose." The documents were also found to be "totally uncorroborated." Grasselli, a coinventor, was furthermore held to be incapable of corroborating conception and reduction to practice. Grasselli exhibit 2 was found not to be self-explanatory, and Miller's testimony was found to be an insufficient explanation thereof. Grasselli exhibit 3, purportedly a laboratory notebook report of the preparation of a catalyst meeting the count, was thought to show oxygen combined with silicon and not antimony as required by the count.

The board also found that Grasselli failed to show how the products of the process, acrylonitrile and methacrylonitrile, were identified and that the testimony of Friedrich did not constitute corroboration for reduction to practice of a process within the scope of the count.

## OPINION

■ We are convinced that the evidence establishes conception and reduction to practice by Grasselli of an invention defined by the count well before March 8, 1967, the earliest date of Dewing.

The primary documentary evidence relied upon by Grasselli before the board consisted of exhibits 2, 3, and 7. Exhibit 2 consists of pages from Miller's notebook dated August 22, 1966, and witnessed by Friedrich on September 1, 1966. Exhibits 3 and 7 were notebook pages which show the preparation of certain catalysts described respectively as having a final composition of 60% (70 Sb/30 U)–40% $SiO_2$ and 70% (95 Sb/5 Fe)–30% $SiO_2$.

Exhibit 2 was explained in Miller's testimony as follows:

That specifically the invention was reduced to practice on August 22, 1966, as shown in Exhibit 2 * * * showing Experiment Number 3443–78;

That he received a container having the marking Cat. 21,2294–100–1a, directly from the laboratory group in which it was prepared. The name "Catalyst 21" stands for a catalyst containing antimony and uranium. The designation "2294–

100–1a" refers to a particular laboratory notebook page and number kept in the permanent records of the laboratory. A true copy of such laboratory record is attached hereto as Exhibit 3. This laboratory notebook record shows that the catalyst designated as 2294–100–1a is a catalyst containing antimony and uranium * * *.

His testimony summarized the experiment that was run on August 22, 1966, reported in exhibit 2 as follows:

The feed ratio of isobutane/air/oxygen/steam/HCl/ammonia was 1/10/1/5/0.-25/1.5. Six cc. of the catalyst described above was used, and the apparent contact time was 3.15 seconds. The reaction temperature was 550°C. The single pass yield defined as the moles of product X 100/moles of reactant fed was 9.1% to methacrylonitrile and 12.2% to acrylonitrile * * *.

It thus appears that an experiment was conducted by Miller on August 22, 1966, which conforms to the limitations of the count *on its face* in all respects except for the limitation regarding the composition of the catalyst to be used in the process. It is uncontradicted, however, that the catalyst *actually used* in the experiment of August 22, 1966, was prepared as described in exhibit 3. That exhibit describes the final catalyst composition as: 60%(70 Sb/30U)–40% $SiO_2$. Exhibits 3 and 7 were signed by Carol Ann Meeks and Warren Knipple, neither of whom was called to testify.

Dewing argues that Grasselli failed to show that he conceived and reduced to practice the process of the count using an antimony oxide catalyst. The limitation regarding the particular ammoxidation catalyst to be used herein, however, recites that the catalyst may be:

antimony oxide alone *or* in combination with at least one other metal oxide selected from the group consisting of tin oxide, titanium oxide, uranium oxide, cerium oxide, iron oxide, thorium oxide or manganese oxide * * *. [Emphasis added.]

Dewing's arguments and the board's opinion are premised throughout on the assumption that the foregoing limitation of the count requires the presence in the catalyst of antimony oxide as a *discrete entity*, i. e., that the presence of antimony with another metal *chemically combined* with oxygen does not satisfy the count. It was noted by the board, for instance, that neither Grasselli nor Miller testified that the catalyst contained antimony oxide, and further that the documentary evidence failed to how the presence of antimony oxide in the final catalyst composition. Grasselli's position, on the other hand, is that the combinations of multi-metal oxide catalysts recited in the count include *chemical combinations*; that they are complex in nature.

We see no reason to limit the count's recitation of the catalyst to physical mixtures of the metal oxides, which would be the only type of "combination" possible if the discrete presence of antimony oxide were required. In the absence of contrary evidence, the count must be given its broadest reasonable interpretation (to include both physical and chemical combinations) and should not be given a contrived, artificial or narrow interpretation which fails to apply the language of the count in its most obvious sense. *Buck v. Desvignes*, 489 F.2d 737, 180 USPQ 193 (Cust. & Pat.App.1973); and cases cited therein. That rule is not limited to "right to make" situations. *Fontijn v. Okamoto*, 518 F.2d 610, 617, 186 USPQ 97, 103 (Cust. & Pat.App.1975). It finds appropriate general application where, as here, the count was suggested by the primary examiner as a phantom count.

Dewing's argument, to the effect that the catalyst must be limited to mixtures or physical "combinations" of antimony oxide with other recited metal oxides, is weakened by his specification, which supports a contrary inference. See *Davis v. Burrows*, 492 F.2d 1405, 181 USPQ 276 (Cust. & Pat. App.1974); see also *Vogel v. Jones*, 486 F.2d 1068, 179 USPQ 425 (Cust. & Pat.App.1973). The Dewing specification provides in pertinent part:

When antimony oxide is used alone it may be present as the trioxide, tetraoxide, or pentaoxide or as a mixture of two or more of these oxides. When oxides of other metals or metalloids are present they may take the form of individual oxides incorporated in the catalyst by physical mixing, *alternatively they may be present in chemical combination with the antimony oxide, for example as an antimonate*; the essential requirement is that the catalyst should consist essentially of antimony, optionally with one or more other metals or metalloids, and oxygen. [Emphasis added.]

The count thus clearly includes chemical combinations wherein the antimony oxide is present only in a compound form with the other metal oxides and is not limited to a catalyst in which antimony oxide and a metal oxide are physically combined. It is not essential to the catalyst composition of the count that antimony oxide be present as a discrete component, the essential requirement being, as described in Dewing's specification, "that the catalyst should consist essentially of antimony, optionally with one or more other metals or metalloids, and oxygen."

The count would be satisfied, therefore, for the purpose of establishing a reduction to practice, by an embodiment which used a catalyst so described. A reduction to practice of that embodiment of the invention would be sufficient to support an award of priority. *Fontijn v. Okamoto*, supra. On that aspect of the case, therefore, the basic question is whether Grasselli's proofs show such a reduction to practice. As we previously noted, exhibit 3 shows the process by which the catalyst was prepared. In examining exhibit 3 for what it fairly shows, we note that on its face and without explanatory testimony from any witness, the exhibit contains certain information on how the final catalyst composition was prepared. The exhibit shows that the starting materials were antimony oxide ($Sb_2O_3$) and technical grade uranium oxide ($U_3O_8$). These starting materials were treated with nitric acide ($HNO_3$), a well-known oxidizing

agent, neutralized and then heat-treated at high temperatures. Thus, the process shown in exhibit 3 begins with antimony oxide, and nothing thereafter occurs which would reduce it to its elemental state. Hence, the processing conditions of exhibit 3 indicate that the experiment on August 22, 1966, was a reduction to practice of an embodiment within the count.

Grasselli's brief refers to experiments conducted by and set forth in the laboratory notebook of coinventor Miller, containing shorthand designations for the catalyst that are similar to the designations in exhibit 2. For instance, several pages from Miller's laboratory notebook were presented with Grasselli's Preliminary Statement. The format of these pages is similar to exhibit 2 showing the feed composition, the temperature, and the final products obtained, among which are methacrylonitrile and acrylonitrile. The catalyst is indicated by a number, referring to another notebook page introduced into evidence as exhibit II. Exhibit II describes as its object the preparation of a catalyst having the composition 82.5 percent $Ni_{10.5}TeBi_{0.5}Sb_{0.5}Mo_{12}O_{55}$–17.5 percent $SiO_2$. This exhibit, we think, further indicates Grasselli's use of catalysts containing antimony oxide in chemical combination with other metal oxides specified in the count.

Exhibits 12 and 14 are referred to in the Miller and Grasselli affidavits. Exhibit 12 shows a catalyst which was used in the experimental runs of exhibit 14. The empirical formula given for that catalyst is: 60 percent $(Sb_{4.56}U_1Fe_{01}O_{1455})$ + 40% $(Si_{11.5}O_{22.6})$, a further example of a catalyst meeting the language of the interference count.

### Corroboration

The board held that Grasselli's evidence lacks corroboration, relying on *Thurston v. Wulff*, 35 CCPA 794, 164 F.2d 612 (1947), which requires proof or evidence independent of the testimony of the inventor. Specifically, the board found with regard to the testimony of Friedrich:

She worked in the same laboratory area as Miller doing her own work which was separate and independent from the work of Miller in the period in question.

While Friedrich testified that Exhibit 2, the experimental writeup dated August 22, 1966, "is the record of the experiment she observed" and that signing her name to the notebook page (on September 1, 1966) "attested to the fact that she had observed the conduct of the experiment", her cross-examination answers show that she was probably on vacation during August 22–26. Furthermore, Friedrich, who had her own work and kept her own notebook had no entries for August 22 and 23, 1966. It is thus clear that Friedrich could not have observed this experiment. It is clear from her cross-examination answers that her signature on Miller's notebook pages means no more than the existence of the pages on the day she signed them. We agree with Dewing et al. that this inconsistency as to the Friedrich statement as to her observing the work of the Exhibit 2 writeup throws grave doubts as to the validity of her testimony. From her cross-examination answers it appears that she obtained her information as to what Miller was doing from what he told her, either orally or in his notebook. This is not the observation necessary to establish independent corroboration for reduction to practice of a process count where knowledge as to details of the operations involved is necessary. Friedrich had no knowledge of Miller's catalyst, feed gas composition or the product or otherwise determine [sic] other reaction features. See *Gortatowsky v. Anwar et al.*, 58 CCPA 1266, 442 F.2d 970. There is no testimony from Friedrich that the catalyst contained antimony oxide. [Record citations omitted.]

Grasselli argues that the board incorrectly applied the principles of law drawn from *Thurston* and that the correct approach to be taken in reviewing the evidence is that *all* the evidence should be reviewed and considered as a whole, citing *Patterson v. Hauck*, 52 CCPA 987, 341 F.2d 131 (1965).

Grasselli further argues that "a rule of reason" should be followed in reviewing the evidence in recognition of the realities of technical operations in modern day laboratories. *Berry v. Webb*, 56 CCPA 1272, 412 F.2d 261 (1969).

█ We agree with Grasselli that the rule of reason finds appropriate application to the evidence presented on this appeal. Whether Friedrich was on vacation on August 22, and whether she was mistaken in stating that she observed the August 22 experiment, cannot control the ultimate conclusion herein. The remainder of her testimony cannot be totally disregarded. As the board recognized, her signature on exhibit 2 establishes that it was actually in existence at the time she signed it. Because the admittedly genuine and witnessed notebook pages in evidence provide the details of the operation, we do not find a requirement herein for proof of what the board called "the observation necessary to establish corroboration." Moreover, Friedrich's testimony reveals that her desk was next to that of Miller, that numerous other related experiments were conducted in her presence and that she was able to watch them in their entirety. A corroborating witness need not, in every case, have an independent recollection of each and every individual experiment that he or she may have seen, particularly where, as here, such eyewitness testimony is not relied upon as the sole corroborating evidence that an experiment was conducted. The dated signature, on a notebook page, of a witness sufficiently familiar with the particular field of technology to understand what is described on that page is evidence, under a rule of reason, upon which one may find corroboration, especially where, as here, that admittedly authentic page was kept in the ordinary course of an organized program of research conducted over an extended period of time.

That the notebook page, exhibit 2, is genuine and was signed well before any thought of this interference arose, i. e., on August 22, 1966, by Miller and on September 1, 1966, by Friedrich, is unchallenged.

Moreover, although exhibit 2 is particularly relied upon for a prior reduction to practice, numerous other experiments evidencing reduction to practice took place over a long period of time and involved witnessing after the date of the experiment, i. e., experiments 3409–38 and 3409–40 (exhibits 6 and 9), signed by Miller on June 8, 1966, and witnessed by Friedrich on June 14, 1966; experiment 3409–66 (exhibit 10), signed by Miller on June 17, 1966, and witnessed by Friedrich on June 23, 1966; experiment 3505–60 (exhibit 14), signed by Miller on November 1, 1966, and witnessed by Friedrich on November 10, 1966; experiment 3584–36 (exhibit 15), signed by Miller on December 21, 1966, and witnessed by Friedrich on December 22, 1966.

### Product Identification

We also disagree with the board's view that Grasselli made no adequate showing with regard to the nature of the products obtained.

Exhibit 2 indicates that there was obtained a yield of 9.1 percent methacrylonitrile and 12.2 percent acrylonitrile. The Miller affidavit sets forth the method of analysis for the products as follows:

A sample of the product collected was injected into a gas-liquid chromatography unit and the presence of the desired nitrile was noted by comparison with a standard run.

This analytical technique for acrylonitrile or methacrylonitrile is a procedure used a great deal in our laboratory since the discovery of new ammoxidation reactions was a primary goal of our laboratory group. The reactants employed were taken from pressurized cylinders of the named reactant purchased commercially.

The presence of the desired nitrile in the product of the experiments was further confirmed by the testimony of Friedrich, an observer, that she saw Miller collect and analyze a sample of the effluent and that he reported to her at a time well before the instigation of this interference that he had obtained methacrylonitrile and acrylonitrile. Friedrich's testimony in this regard should

312

not be discounted simply because as indicated above, a discrepancy appeared in her testimony that she was "probably" on vacation when Miller actually conducted the exhibit 2 experiment. Her testimony is sufficiently general to encompass a Miller report subsequent to that experiment and to apply to all of the experiments conducted by Miller as set forth in the record. Corroboration exists in the testimony of Friedrich and at least in the witnessed notebook records.

We are not confronted with a situation such as that presented in *Thurston*, supra, where the alleged corroborating evidence apparently failed to establish the identify of the material which was physically in evidence as of a date earlier than the critical date. The products of the process set forth in the count herein are unsaturated nitriles, namely acrylonitrile and methacrylonitrile, both of which are well-known chemicals. The starting materials are also well-known. The facts of this case thus present a question similar to that in *Patterson v. Hauck*, supra, i. e., "whether a simple *process*, using *known* materials, was or was not practiced." Id. 52 CCPA at 991, 341 F.2d at 134. When the product is known, the degree of evidence necessary to establish its identity is not the same as that required to establish the identity of a new composition of matter. As we recognized in *Young v. Bullitt*, 43 CCPA 932, 937, 233 F.2d 347, 351 (1956), a long line of authority stands for the rule that

> a complete chemical analysis is not always necessary to identify a product, but that various other factors, including the materials used, the procedures followed, and the skill and experience of the experimenters, are to be considered.

> The question generally is whether, when all the circumstances are considered together, there is a reasonable certainty as to the identity of the product. Proof beyond a reasonable doubt is not necessary where, as here, the applications of the parties were copending.

We think that rule is applicable here. Coinventors Grasselli and Miller were both skilled and experienced workers in the

acrylonitrile technology area. Considering all of the evidence, we think it has been shown to a reasonable degree of certainty that the inventors were satisfied at the time that the experimental processes described in the exhibits of record produced the desired products and that the products were in fact produced by the described processes.

In view of all of the contemporaneous notebook records relating to Miller's activity, and in the absence of any evidence that the notebook records were fabrications or that any of the entries therein were other than genuine expressions of the coinventors' thoughts and deeds during the relevant time period, we hold that prior reduction to practice was established by Grasselli.

Accordingly, the decision of the board must be *reversed*.

*REVERSED.*