FONTIJN, Appellant,

v.

OKAMOTO et al., Appellees.

Patent Appeal No. 74–594.

United States Court of Customs
and Patent Appeals.

June 19, 1975.

Caspar C. Schneider, Jr., John B. Pegram, New York City, attorneys of record, for appellant. Tom R. Vestal, Asheville, N. C., Davis, Hoxie, Faithfull & Hapgood, New York City, of counsel.

Mark A. Greenfield, New York City, Sherman & Shalloway, Washington, D. C., attorneys of record, for appellees.

Before MARKEY, Chief Judge, RICH, LANE and MILLER, Judges, and ALMOND, Senior Judge.

ALMOND, Senior Judge.

The junior party Fontijn appeals from the decision of the Patent and Trademark Office (PTO) Board of Patent Interferences in interference No. 97,765 awarding priority of invention to the senior party Okamoto et al. (Okamoto). We reverse.

Fontijn is involved on patent No. 3,447,308 based on a United States application serial No. 663,812, filed August 28, 1967, claiming the priority of a Netherlands application No. 66–12,628, filed September 8, 1966; and on a reissue application serial No. 230,815, filed March 1, 1972, which seeks to amend patent No. 3,447,308 by inserting a reference to United States application serial No. 580,-817, filed September 20, 1966, and also seeks the benefit of Netherlands application No. 65–12,918, filed October 6, 1965. Okamoto is involved on application serial No. 43,101, filed June 3, 1970, as a continuation of serial No. 607,302, filed January 4, 1967, claiming the priority of a Japanese application No. 560/66 filed January 7, 1966.

## The Subject Matter

The subject matter of the interference is a yarn which is useful as a reinforcing material in a variety of articles including automobile tires. The yarn consists of a plurality of bicomponent filaments each of which is composed of a matrix of one polymer and "a multiplicity of continuous ultrafine cores" of a second polymer incompatible with the first which are "distributed substantially uniformly throughout the longitudinal body of the matrix."

Count 1, taken from the Fontijn patent, is typical and reads as follows:

1. Yarn consisting of a plurality of composite filaments, each filament comprising at least two different incompatible synthetic linear high polymers, one polymer functioning as a matrix and the other consisting of a multiplicity of continuous *ultrafine cores* distributed substantially uniformly throughout the longitudinal body of the matrix, *each core being characterized by its uniformity in cross-sectional dimension* and the cross-sectional dimensions from core to core being of the same order of magnitude, said cores being further characterized by their substantially continuous nature. [Emphasis added.]

Counts 2–4 add limitations immaterial to the issues before us.

## Background

Sometime prior to October 6, 1965, the party Fontijn, a resident of the Netherlands, apparently developed the concept of having a bicomponent filament with a multitude of continuous ribbon-like subfilaments or "cores." On October 5, 1965, a Netherlands patent application No. 65–12,918 was filed on the product and a process for making it. A United States application serial No. 580,817 ('817), corresponding to Netherlands 65–12,918, was filed on September 20, 1966 and, pursuant to the provisions of 35 U.S.C. § 119, a timely claim for priority of the Netherlands application with supporting documents was also filed.

The '817 application, the disclosure of which is substantially similar to corresponding Netherlands application No. 65–12,918, describes "a synthetic fibrillary product * * * made up of a plurality of immiscible components which are finely distributed over the cross-section of the structure and which substantially occur as endless shreds or ribbon-like layers." Two embodiments of the invention are illustrated below as they

appear in the drawings of the '817 application:

*Fig. 4ª.*     *Fig. 4ᵇ*

POLYACRYLONITRILE
NYLON 6
POLYETHYLENE TEREPHTHALATE
POLYVINYL ALCOHOL

Fig. 4a shows a cross-sectional view of a disclosed fibrillary product in the form of a filament. Fig. 4b shows a cross-sectional view of an alternative embodiment in the form of a filament having a multilayered core surrounded by an outer sheath.

Fibrillary products, according to prior art techniques discussed in the '817 specification, had been produced by forcing a spinning mass consisting of a plurality of finely intermingled immiscible components through an extrusion orifice and then solidifying the product in one of several ways depending upon the characteristics of the component materials. The known process was modified, according to the specification, to produce the disclosed fibrillary product as follows:

> [P]rior to being forced through the extrusion orifices into a solidifying zone, the components are finely intermingled by dividing each of the streams of the components into a main stream containing secondary sub-streams and having a uniform distribution pattern and in that the main stream is distributed over the various extrusion orifices so that a plurality of secondary sub-streams of each component is passed through each orifice.
>
> Dividing and reuniting of the substreams may be effected only once in order to produce products having endless shreds of one component, i. e., fila-

ment-like strips or bodies that are embedded within the other component. However, according to this invention it is preferred that the dividing and reuniting of the sub-streams should be repeated several times in order to form a main stream of the spinning mass in which the components are arranged in a multi-layered structure. It has been found that in this way it is possible to obtain a finer intermingling of the components.

A product having a layered structure that is enveloped in a thin sheath (as shown in Figure 4b) may according to the invention be obtained by dividing the main stream into a plurality of composite streams containing both of said components and by surrounding each of the composite streams of liquid before passing them through the extrusion orifices, with a sheath-like liquid layer which is preferably formed by one of the components. In this regard, it will be appreciated that processes are known for the manufacture of composite threads that possess a sheath and a core.

Subsequent to October 6, 1965, the filing date of Netherlands application No. 65–12,918, Fontijn apparently determined that the ribbon-like nature of the cores disclosed in the Netherlands application could be further subdivided and changed to a substantially round configuration, and a subsequent Netherlands application No. 66–12,628 was filed on September 8, 1966, directed to this subject matter. A corresponding United States application serial No. 663,812 was filed on August 28, 1967. Thereafter, during the early part of 1968, the '817 application was expressly abandoned.

On June 3, 1969, Fontijn patent No. 3,447,308, involved in this interference, issued from application serial No. 663,-812.[1]

---

1. Netherlands application 65–12,918 and the corresponding U. S. application serial No. 580,-817 named three persons as co-inventors, Messrs. Fontijn, Woestenenk, and Bezemer. Netherlands application 66–12,628 and corresponding U. S. application serial No. 663,812 named two persons as co-inventors, Messrs.

Fontijn and van Drunen. The interference examiner determined that a sufficient showing had been made that Wilhelmus J. Fontijn was the sole inventor of the subject matter of U. S. patent No. 3,447,308, and this issue has not been raised in the appeal.

The portion of the patent's disclosure considered particularly relevant by the board to its determination is as follows:

According to this invention, the system consists of feeding two polymers separately until they reach a mixing device capable of forming the polymer into a strongly laminated stream which is subsequently fed to the spinning orifices in a spinneret plate. According to the invention, the laminae which are to form the cores are finely divided in that before being distributed over the spinning orifices and while the same direction of flow is maintained, the multi-laminated stream, in a plane transverse to the direction of the laminae flow, is temporarily split up at least once into substreams with transverse dimensions of the order of magnitude of the lamina thickness in situ. The critical part of the apparatus is the disposition of at least one gauze screen and preferably several immediately before the spinneret plate. The gauze screen has a mesh width of approximately 2 x *n,* where *n* represents the thickness of the laminae at the gauzes of the core material formed in the process, which gauzes may, if necessary, be combined into a pack, at least one gauze of which has a relatively large mesh width.

It should be noted that the composition of these gauze screens is very critical. If the gauzes are too coarse or too small in number, then the filaments will continue to distinctly show a laminated structure. However, on the other hand, if the gauzes are too fine or too large in number, then it is found that in the case of several polymer combinations, the polymer is subject to unduly high degradation which causes spinning difficulties. However, with the use of the screen pack described above, an optimum fine distribution of the ultrafine core material in the basic matrix is obtained.

The board also considered the following description of the drawings:

Figure 3 [reproduced below] shows the pattern of the laminated stream of the spinning liquid after it has passed the combination of the gauzes 11. While passing through the gauzes, the laminae are divided into separate streams which, under the influence of surface tension and viscous forces in the spinning liquid, do not reunite into continuous layers after they pass through the gauzes but assume a substantially round cross section (see Figure 4 [shown below]).

In this way, such a large number of separate streams of the spinning liquid forming the cores are obtained that about 150 cores can be counted in one filament. This fine subdivision does not lead to degradation of the polymers and, as will be shown hereinafter, the several properties of these multifilament yarns are far more favorable than when the laminae are not split up by the gauzes.

FIG. 3     FIG. 4

The patent as issued contained no reference either to the '817 application or to corresponding Netherlands application No. 65-12,918. To insert such reference, reissue application serial No. 230,815 was filed on March 1, 1972, more than two years from the grant of the original patent.

The Okamoto development resulted in the filing in Japan of a patent application No. 560/66 on January 7, 1966. A corresponding United States patent application serial No. 607,302 was filed on January 4, 1967, and a timely claim for priority of the Japanese application was made and benefit thereof has been accorded. On June 3, 1970, Okamoto filed a continuation of serial No. 607,302, application serial No. 43,101 which is involved in this interference, and the parent application matured into U. S. patent No. 3,531,368 on September 29, 1970.

Shown below, substantially as it appears in Fontijn's brief, is a table summarizing the pertinent dates involved in this appeal:

| | Fontijn | Okamoto et al. |
|---|---|---|
| Oct. 6, 1965 | Netherlands No. 65–12,918 | |
| Jan. 7, 1966 | | Japan No. 560/66 |
| Sep. 8, 1966 | Netherlands No. 66–12,628 | |
| Sep. 20, 1966 | U. S. Serial No. 580,817 | |
| Jan. 4, 1967 | | U. S. Serial No. 607,302 |
| Aug. 28, 1967 | U. S. Serial No. 663,812 | |
| Jan. 19, 1968 | U. S. Serial No. 580.817 becomes, abandoned | |
| June 3, 1969 | U. S. 3,447,308, issues from Serial No. 663,812 | |
| June 3, 1970 | | U. S. Serial No. 43,101 filed as a continuation of Serial No. 607,-302 |
| Sep. 29, 1970 | | 3,531,368 issues from Serial No. 607,302 |
| Mar. 1, 1972 | Reissue Application Serial No. 230,815 | |

## Patent Office Interference Proceedings

In his decision on motions, the primary examiner found that Okamoto was entitled to the benefit of Japanese application serial No. 560/66 filed January 7, 1966. Fontijn has not questioned this decision. The primary examiner also permitted Fontijn to add reissue application serial No. 230,815 to the interference, commenting:

It is felt there is adequate common subject matter between U. S. Patent 3,447,308 and previously filed U. S. application 580,817 to support the conclusion that U. S. Patent 3,447,308 is in fact a continuation-in-part of application 580,817.

Fontijn's further motion for the benefit of his earlier applications and to shift the burden of proof was granted only with regard to Netherlands application serial No. 66–12,628, filed September 8, 1966. Benefit of United States application serial No. 580,817, filed September 20, 1966, and Netherlands application serial No. 65–12,918, filed October 6, 1965, was denied. The examiner commented:

[T]he additional subject matter added to the U. S. Patent 3,447,308, which becomes a continuation-in-part of U. S. application Serial No. 580,817 by the reissue application 230,815, is not disclosed in U. S. application Serial No. 580,817 or the Netherlands application Serial No. 65–12918 and it is this additional subject matter which is claimed and has become the subject of the counts in the instant interference.

### The Board's Opinion

The basic issue considered by the board was whether Fontijn should be entitled to rely upon the '817 application and corresponding Netherlands application 65–12,918, the latter of which antedates Okamoto's first Japanese application by some three months. This is hereafter the support issue.

Citing our decision in *Stansbury* v. *Bond,* 482 F.2d 968 (CCPA 1973), the board commented:

In the instant case, we believe that the issue before us should be resolved by consulting the specification of the Fontijn patent, since we are faced with a similar situation as confronted the Court in *Stansbury v. Bond, supra.*

We find that whereas the use of the critical part of the Fontijn et al. apparatus, namely, the gauze screen results in the formation of the ultra fine cores reading on the counts in issue, we perceive neither an express disclosure of "ultra fine cores" in the parent Fontijn et al. application nor are we directed therein to the use of any special apparatus which will necessarily cause the formation of the ultra fine cores in the product of the count.

Moreover, as pointed out above, Fontijn states in * * * his patent that according to his invention, laminae of a laminated stream are finely divided in a plane transverse to the direction of flow, into cores which are identified as being "finely divided." Thus in the involved patent Fontijn

distinguishes between laminae on the one hand and the fine subdivision which characterizes the invention of the involved Fontijn patent on the other. It is clear to us that the parent Fontijn application discloses only the above laminated structure which is the intermediate product from which the product of the present counts is prepared. In our opinion Fontijn cannot now successfully urge that the counts read on a laminated structure which has not been so subdivided.

Accordingly, we hold that the Fontijn et al. reissue application is not entitled to the benefit of the parent application 580,817 under 35 USC 120 for failure to comply with the first requirement of the first paragraph of 35 USC 112. Wagoner v. Barger, [59 CCPA 1213, 463 F.2d 1377,] 175 USPQ 85 (1972).

Although no question was raised by Okamoto with regard to the propriety of the Fontijn reissue application, the board exercised its discretion pursuant to the provisions of Rule 258,[2] 37 CFR 1.258, to consider the issue. The board commented:

In order to prevail herein, Fontijn et al. must rely on the involved reissue application since he cannot prevail on the basis of the involved patent whose effective date of September 8, 1966 based on Netherlands application 66–12628 is subsequent to January 7, 1966, the record date of Okamoto.

According to the Reissue Declaration in the file of the reissue application, the sole purpose of filing said application was to cure a "defective specification" since the original Fontijn patent 3,447,308 (herein involved) failed to contain a reference to earlier-filed copending application serial no. 580,817, filed September 20, 1966. Further, the reissue declaration goes on to state that Netherlands application No. 65–12918, filed October 6, 1965 was omitted from the oath in said issued patent. Fontijn needs the benefit of both of these applications to gain an award of priority in the instant proceeding.

The Fontijn et al. reissue application was filed March 1, 1972, almost three years after the involved Fontijn et al. patent issued on June 3, 1969.

We hold that the Fontijn et al. reissue was not a proper reissue, being in violation of the last paragraph of 35 USC 251.

That paragraph reads:

No reissued patent shall be granted enlarging the scope of the claims of the original patent *unless applied for within two years from the grant of the original patent.* (emphasis added [by board])

In an ex parte case, State of Israel v. Brenner, 155 USPQ 486 (1967) the District Court of the District of Columbia held that the phrase "claim in the patent" as used in 35 USC 251 includes a claim to a right of priority on the basis of a foreign filing date and is not limited to claims defining the invention; that a patent may be reissued for the purpose of establishing a claim to priority which was not asserted, or which was not perfected during the prosecution of the original application; and accordingly concluded that the plaintiff was entitled to a reissue of its patent. In that proceeding we note that the original patent issued on August 3, 1954. The reissue application was filed August 30, 1965 so that the last paragraph of 35 USC 251 was not involved.

\*    \*    \*    \*    \*    \*

It should be noted that the District Court in the Israel case held that the term "claim" in Section 251 should be interpreted as including a claim for a right of priority. It therefore appears that a claim for priority which in-

---

**2.** Rule 258, 37 CFR 1.258, provides in part that the Board of Patent Interferences, to prevent manifest injustice, may, in its discretion, consider questions of patentability of a claim even though it was not raised by an appropriate motion of a party.

cludes something not previously claimed should be subject to this time limitation.

In our view, therefore, the Fontijn et al. reissue is a broadened reissue which enlarges the scope of the "claims of the original patent" and should have been timely filed in accordance with the statute. In contrast with the cited case, we note in the instant proceeding that the Patent Office was not informed at any time during the ex parte prosecution of the application (which matured into the involved Fontijn et al. patent) of the existence of the patent [sic parent] 580,817 application filed September 20, 1966 and its corresponding Netherlands convention application filed October 6, 1965.

This is hereafter the reissue question.

## OPINION

### The Support Issue

■ In the absence of ambiguity, it is fundamental that the language of a count should be given the broadest interpretation it will reasonably support, and should not be given a contrived, artificial or narrow interpretation which fails to apply the language of the count in its most obvious sense. *Buck* v. *Desvignes,* 489 F.2d 737 (CCPA 1973), and cases cited therein.

This general rule finds frequent application where a claim is copied from a patent or application and the issue is the copier's "right to make" the count. *Gubelmann* v. *Gang,* 408 F.2d 758, 56 CCPA 1013 (1969).

An often paraphrased reason given in support of this rule appears in *Wirkler* v. *Perkins,* 245 F.2d 502, 44 CCPA 1005 (1957):

> The law is well settled that once an applicant has selected language which is somewhat broad in its scope, he runs the risk that others with specifically different structures may be able to meet the language selected, and he will not be allowed to urge later that the language which he has selected should only be read in the light of his disclosure merely because it originated with him. *Kuppenbender* v. *Riszdorfer,* 104 F.2d 791, 26 C.C.P.A., Patents 1436, 1441 [1939].

■ This rule of broad count construction is not limited to "right to make" situations but is also equally applicable to prior "constructive reduction to practice" situations. Either party may seek to benefit from broad construction of the count so that different embodiments of the invention defined in the count may be supported by the specification of a previously filed application in the United States pursuant to section 120 [3] and/or a previously filed foreign application for the same invention pursuant to section 119.[4] See *In re Ziegler,*

---

3. 35 U.S.C. § 120 provides:

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

4. 35 U.S.C. § 119 provides in pertinent part:

An application for patent for an invention filed in this country by any person who has,

or whose legal representatives or assigns have, previously regularly filed an application for a patent for the same invention in a foreign country which affords similar privileges in the case of applications filed in the United States or to citizens of the United States, shall have the same effect as the same application would have if filed in this country on the date on which the application for patent for the same invention was first filed in such foreign country, if the application in this country is filed within twelve months from the earliest date on which such foreign application was filed; but no patent shall be granted on any application for patent for an invention which had been patented or described in a printed publication in any country more than one year before the

347 F.2d 642, 52 CCPA 1473 (1965). Whether the previously filed application is a foreign application sought to be relied upon pursuant to 35 U.S.C. § 119 or a domestically filed application governed by 35 U.S.C. § 120, its disclosure must satisfy the requirements of the first paragraph of 35 U.S.C. § 112 with regard to the invention relied upon therein. *In re Ahlbrecht,* 435 F.2d 908, 58 CCPA 848 (1971); see further *Kawai* v. *Metlesics,* 480 F.2d 880 (CCPA 1973).

■ The burden on a party of proving support for the count is a heavy one regardless of whether he is a junior or senior party in the interference. *Wagoner* v. *Barger,* 463 F.2d 1377, 59 CCPA 1213 (1972).

■ When the language of the count is found to be ambiguous, an exception exists to the generally applied rule of broad construction of count language and resort may be had to the specification of the patent or application from which the language originated to determine its meaning. *Rion* v. *Ault,* 482 F.2d 948 (CCPA 1973). Determining whether an ambiguity exists requires consideration of both the wording of the count and the arguments of the parties where those arguments make it clear that the language of the count may have different meanings. *Stansbury* v. *Bond,* supra; see also cases cited therein.

■ With the above in mind, we think that where an ambiguity is found to exist either in the express wording of the count or based upon the arguments of the parties making it clear that the language of the count may have different meanings, resort to the specification is for the limited purpose of resolving the ambiguity. Such a finding should not be construed as a license to permit the wholesale rewriting of the count based upon the detailed contents of the originating specification.

It is our view that the counts in this appeal are ambiguous, if at all, *only* in

the recitation of the phrase "multiplicity of continuous ultrafine cores," because the relative fineness of the core material of the fibrillary product may arguably be unclear.

■ Okamoto argues: "as defined in this count, the term 'ultrafine core' can only mean a round or substantially round core, particularly when it is read in connection with the phrase 'characterized by its uniformity in cross-sectional dimension.'" However, we see no basis for reading in an *additional* limitation of shape for the core material. Certainly the phrase "uniformity in cross-sectional dimension" provides no basis for ascribing a particular shape to the core material of the counts. No matter what shape the core material may be, its cross-sectional dimension need only be uniform along the length of the core to meet the counts. Broad language in a count is not ambiguous simply because it is capable of being read on several embodiments.

■ To interpret the phrase "ultrafine cores" as reading only on *round* "ultrafine cores," as Okamoto urges, would be contrary to the well-established rule that limitations not clearly included in a count will not ordinarily be read into it. See 1 Revise and Caesar, *Interference Law and Practice,* 125–130 (1940), and cases cited therein. See also *In re Beale,* 378 F.2d 970, 54 CCPA 1472 (1967); *Durdin* v. *Nordell,* 190 F.2d 211, 38 CCPA 1187 (1951).

Looking to the specification of the Fontijn patent from which the counts originated to determine more precisely the range of dimension contemplated for the fibrillary cores of the counts, the initial description provides only that:

The material is made up of multifilament synthetic linear high polymer yarns, each yarn having a plurality of filaments and each filament composed of at least two different polymers. One polymer functions as the matrix and the other polymer consists of a

date of the actual filing of the application in this country, or which had been in public

use or on sale in this country more than one year prior to such filing.

multiplicity of continuous cores having substantially the same length as, and being disposed uniformly throughout, the matrix. *The cores are characterized by their uniformity in cross-sectional dimensions and by their substantially continuous nature.* [Emphasis added.]

We find, however, in the specification's recitation of a specific embodiment a more precise range contemplated for the relative ultrafineness of the cores:

[T]he cores must, according to the invention, *measure less than 4 microns in cross section, and preferably less than 1 micron.* These cores should be uniformly distributed throughout the longitudinal body of the matrix. [Emphasis added.]

It further appears from the specification's discussion of the relevant prior art that fibrillary cores per se having cross-sections of this order of magnitude, i. e., less than 4 microns and preferably less than 1 micron, were not regarded as a critical feature of the invention in relation to similar known composite filaments. The specification states:

In U. S. application Ser. No. 368,028, filed May 18, 1964, now Patent No. 3,369,057, there is disclosed a method for the preparation of composite filaments, that is, filaments containing an intimate mixture of two synthetic linear high polymers. In this system the different polymers are mixed either in the dry form, that is, as chips or powder, or, alternatively, one polymer is added to the other in the form of a concentrated dispersion. The mixture is melted and extruded to form a composite filament and one of the components is "microfibrils of an average diameter of about 0.3 to 0.4 micron and an average length of 100 microns." From this it can be seen that the length of the fibrils is extremely small, namely, approximately 0.004″. Therefore such minute fibrils have no length to speak of and are certainly not continuous in any sense of the word. The product of the Dutch application is known as Allied EF–121.

As stated, when the two different polymers are intermingled prior to extrusion, a filament is formed having only minute fibrils within the other polymer and they are not continuous. Such a process cannot be employed to produce a large number of continuous cores per filament. It has been determined that such small fibrils result in a considerable loss of fatigue resistance which may be due to the ends of the fibrils cutting into the basic polymer. Another drawback in this type of spinning from a mixture of granulated or pulverized polymer is that the mixing of the two polymers at this stage can never be ideal. The composition of the filaments in cross section, therefore, varies considerably through the length of the filament which makes it impossible for the yarn to ever obtain the optimum mechanical properties necessary for the use thereof in carcass fabrics. This product, therefore, is deficient in several important properties when used as a reinforcement for automobile tires and the like. These deficiencies will be seen from a table appearing further on in the specification.

Thus, the deficiencies overcome by the invention described in the patent did not reside in providing a core material that was more fine than the fibrillary cores of the prior art, because similar prior art composite filaments had cores or microfibrils "of an average diameter of 0.3 to 0.4 micron," clearly within the range contemplated for the cross-sectional dimension of the cores described in the counts. Therefore, the only reasonable interpretation of the relevant count language resulting from our analysis of the specification is that what is being referred to is a category or general class of composite filaments that are characterized as having "continuous ultrafine cores."

It thus remains only for us to determine whether the disclosure of the Fontijn '817 specification (and the corresponding earlier filed Netherlands appli-

cation) supports a finding of a constructive reduction to practice of an embodiment of the counts. At the outset, it appears from the following preliminary discussion of the prior art therein that the '817 specification is referring to the same category of composite fibrillary products having "ultrafine cores" as that described and claimed in patent 3,447,-308:

> Synthetic fibrillary products containing a mixture of different immiscible components are known. They have various applications. For instance, *such products may be used for obtaining ultra-fine fibers or filaments* which are difficult to make by direct spinning. In order to produce *such ultra-fine materials,* one of the components is entirely or partly dissolved from the filamentary product. As a result, the fibrillary products disintegrate into numerous *fine fibers or filaments.* [Emphasis added.]

The specification then describes certain drawbacks of the known products:

> [T]he use of known fibrillary products has been limited, because of the drawbacks they present.

> These drawbacks are due to the known fibrillary products being spun from a mass obtained by mixing the two components with vigorous stirring. In the spun product the two components therefore occur as fibrils of finite length and highly irregular dimensions. Consequently, when the fibrillary product is processed into very fine fibers, the fibers obtained will show a very irregular denier and length. Moreover, the length and denier in a high percentage of fibers are unfavorable.

> Also, when the known fibrillary products are used for the manufacture of artificial leather, the properties of the leather will widely differ from point to point and a non-uniform product is obtained. Moreover, it has been found that the strength of the product is unfavorably influenced by the presence of a high percentage of very short fibrils.

These disadvantages were apparently overcome by the fibrillary products of the invention which are described in the specification:

> Thus, this invention contemplates a synthetic fibrillary product comprising a continuous elongated structure, i. e., threat, filament, sheet, or the like, made up, of a plurality of immiscible components which are finally distributed over the cross-section of the structure and which substantially occur as endless shreds or ribbon-like layers.

 Clearly the invention described in the disclosure of the '817 specification was an improvement on the known types of composite filamentary materials having ultrafine cores in a matrix of an immiscible second component that could optionally be dissolved leaving only the core material in the form of ultrafine fibers or filaments. The disclosed improvement resided in the "substantially continuous nature" of the cores and their "uniformity in cross-sectional dimension." Notwithstanding that round or substantially round ultrafine cores are also included within the scope of the count, there is no requirement that the '817 specification disclose round or substantially round cores. The disclosure of the earlier filed application need only be sufficient to support a finding of a constructive reduction to practice of an embodiment of the invention which meets the counts. *Fried* v. *Murray,* 268 F.2d 223, 46 CCPA 914 (1959); *In re Kyrides,* 159 F.2d 1019, 34 CCPA 920 (1947); *Kyrides* v. *Anderson,* 121 F.2d 514, 28 CCPA 1336 (1941). The composite filaments having endless shreds of ribbon-like cores are clearly such an embodiment, and the '817 specification and corresponding Netherlands application No. 65–12,918 clearly satisfy the first paragraph of section 112 with regard to this embodiment. This is not disputed.

We do not agree with the board that the presence in the spinning apparatus of at least one gauze screen immediately before the spinneret plate to obtain an

optimum fine distribution of round or substantially round ultrafine cores in the basic matrix is a critical feature of the *product.* Fontijn aptly points out that "the application as filed contained claims to process and apparatus as well as to the product," so that the designation of at least one gauze screen as critical to the apparatus does not mean that *round cores* were intended to be a critical feature of the product. At best it can only be said that round cores were regarded as advantageous in the product claimed, and we note that this preferred embodiment is covered by claim 8 of Fontijn's patent.

### The Reissue Question

Assuming for the purposes of this appeal that the Board of Patent interferences acted within its authority under Patent and Trademark Office Rule 258, 37 CFR 1.258, it remains only for us to consider the propriety under section 251 of Fontijn's reissue application, serial No. 230,815, filed more than two years after the issuance of the original patent for the sole purpose of perfecting a claim to priority.

Section 251 reads in pertinent part as follows:

> Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee *claiming* more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

> \*   \*   \*   \*   \*   \*

> No reissued patent shall be granted enlarging the scope of the *claims* of the original patent unless applied for within two years from the grant of the original patent. [Emphasis added.]

■ We hold that a reissue application filed for the sole purpose of perfecting a claim to priority does not broaden the scope of the claims of the original patent and is not in contravention of the requirements of section 251 even though filed more than two years after the patent grant. Cited as the sole support for the board's construction of the statute is *State of Israel* v. *Brenner, Comr. Pats.,* 273 F.Supp. 714 (D.D.C.1967), aff'd 130 U.S.App.D.C. 318, 400 F.2d 789 (1968). The issue therein was whether a reissue application, applied for *less than* two years after the grant of the original patent, was a proper mechanism for perfecting a claim for priority under 35 U.S.C. § 119, the relevant second paragraph of which provides:

> No application for patent shall be entitled to this right of priority unless a claim therefor and a certified copy of the original foreign application, specification and drawings upon which it is based are filed in the Patent Office before the patent is granted, or at such time during the pendency of the application as required by the Commissioner not earlier than six months after the filing of the application in this country. Such certification shall be made by the patent office of the foreign country in which filed and show the date of the application and of the filing of the specification and other papers. The Commissioner may require a translation of the papers filed if not in the English language and such other information as he deems necessary.

A certified copy of the corresponding foreign application had not been filed in the application that matured into the original patent, and the patent as issued did not recite a claim for priority as of the foreign filing date. The district court found

> that the phrase "claim in the patent" as used in Section 251 includes a claim to a right of priority on the basis of a foreign filing date and is not limited

to claims defining the invention; that a patent may be reissued for the purpose of establishing a claim to priority which was not asserted, or which was not perfected during the prosecution of the original application; and that, accordingly, the plaintiff is entitled to a reissue of its patent.

The opinion of District Court Judge Holtzoff emphasized that it was the intent of Congress, in enacting the remedial statute, to provide an effective method for correcting errors made by applicants and their attorneys without deceptive intent. Judge Holtzoff stated:

> It is apparently the view of the Patent Office that the clause in this statute permitting the grant of a reissue patent "by reason of the patentee claiming more or less than he had a right to claim in the patent" is limited to the claims defining the invention and does not extend to a claim to a right of priority on the basis of a foreign date. In the opinion of this Court, this is too narrow a view. No reason is perceived why the word "claim" should be construed and confined to claims to the invention. Section 119 uses the term "claim" in connection with a right of priority. No basis is discernible for not interpreting the word "claim" used in Section 251 as comprising claims of both types; claims to the invention and claims to rights of priority under Section 119. Such a construction seems reasonable. It gives full force and effect to both Sections and meets the possible contention that the two may be inconsistent. *The purpose of the statute governing reissue of patents is to provide a remedy and method for correcting errors made by applicants or their attorneys. The Congressional intent should be effectuated and should not be defeated or limited by artificial restrictions. The statute is remedial and should be liberally construed.* Application of Willingham (Cust. & Pat.App.) 282 F.2d 353 [127 USPQ 211 [1960]]. [Emphasis added.]

The above emphasized portions of the court's opinion are particularly appropriate to our consideration of the meaning of the word "claims" as it appears in the last paragraph of section 251, supra.

We fail to see how this remedial statute would be "liberally construed" or how Congressional intent would be effectuated by interpreting the phrase "claims of the original patent" appearing in the last paragraph of section 251 to include anything other than, or in addition to, the claims of the patent *to the invention.* Consistent with this view, in *Sticker Industrial Supply Corp. v. Blaw-Knox Co.,* 321 F.Supp. 876 (N.D.Ill.1970), the court rejected the argument that a reissue application adding a claim to the benefit of an earlier application and not applied for within the two year period required by section 251 broadens the scope of the reissue claims by recapturing prior art which had been held to be in the public domain. The court commented:

> It is not readily apparent how prior art can broaden the claims of a patent. More realistically, the reissue patent will deprive [the declaratory judgment] plaintiff of the defense of a specific incidence of prior public use more than one year before the patent issued. * * * [T]he beneficent purpose of § 251 was to restore a reissue patentee to the conditions which existed on the date of his original patent.

■ Our review of this court's prior decisions further convinces us that "the claims of the patent" referred to in the last paragraph of section 251 are the claims to the invention, inferentially excluding any claim for the benefit of a previously filed application in the United States pursuant to section 120 or a foreign application filed pursuant to section 119. What section 251 prohibits is the reissuance of a patent applied for more than two years from the date of grant of the original patent having one or more claims which are broader in scope than the claims of the original patent. *In re Ruth,* 278 F.2d 729, 47 CCPA 1014 (1960).

A claim of a reissue application is broader in scope than the original claims if it contains within its scope "any conceivable apparatus or process which would not have *infringed* the original patent" [emphasis added]. *In re Ruth, supra; In re Bostwick,* 102 F.2d 889, 26 CCPA 1122 (1939); *In re Rogoff,* 261 F.2d 601, 46 CCPA 733 (1958).

Consistent with this view, we note that P. J. Federico in his *Commentary on the Patent Act* (35 U.S.C.A., pp. 1, 44) provides a test for determining whether a reissue enlarges the scope of the claims under this part of the statute which further convinces this court that the claims referred to in the last paragraph of section 251 are the claims of the patent *to the invention:*

> The statute does not define a broadened reissue, or a reissue which enlarges the scope of the claims of the original patent, but the cases indicate that the general rule is that if a claim of a reissue can hold something as an infringement which would not be an infringement of any of the claims of the original patent (not considering the validity of such claims), then the particular claim of the reissue enlarges the scope of the claims of the original patent, and that a claim is broadened if it is broadened in any respect.

Clearly, the only "claims" of a patent which can be infringed are the claims *to the invention,* and we find nothing inconsistent with this interpretation in either the *decision* of the district court in *State of Israel* v. *Brenner, supra,* which construes the first paragraph of section 251 or in the court's opinion which emphasizes the remedial purpose of the statute.

We are also not persuaded of the impropriety of appellant's reissue application based upon his failure to notify the Patent and Trademark Office during the ex parte prosecution of the original patent of the existence of the '817 application and the corresponding Netherlands convention application filed October 6, 1965. The equitable interests of any party who might have been misled by a lack of notice of the 1965 priority date are adequately protected by 35 U.S.C. § 252, which provides in pertinent part:

> No reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent, to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use or sale of the thing made, purchased or used as specified, or for the manufacture, use or sale of which substantial preparation was made before the grant of the reissue, and it may also provide for the continued practice of any process patented by the reissue, practiced, or for the practice of which substantial preparation was made, prior to the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

Apropos this point are the comments of the Court of Appeals in *Brenner, Comr. Pats.* v. *State of Israel,* 130 U.S. App.D.C. 318, 400 F.2d at 791:

> We think that it is altogether possible that Section 252 can be read broadly enough to protect a deserving third party in this kind of situation. In any event a court sitting in equity, in a dispute between a patentee who had received a reissue patent with the priority right included and an infringer who had, with no warning of any kind, honestly relied on the original patent without the priority right, could justly

accommodate these conflicting claims in the light of the particular circumstances. [Footnote omitted.]

Accordingly, the decision of the Board of Patent Interferences is reversed.

Reversed.