**ANDREW CORPORATION, Plaintiff,**

**v.**

**GABRIEL ELECTRONICS, INC., Defendant.**

**Civ. No. 90–0032–P.**

United States District Court, D. Maine.

Jan. 6, 1992.

John M.R. Paterson, Bernstein, Shur, Sawyer & Nelson, Portland, Me., Stephen G. Rudisill, Arnold, White & Durkee, Chicago, Ill., for plaintiff.

John Hubbard Rich, III, Perkins, Thompson, Hinckley & Keddy, Portland, Me., Charles E. Pfund, Boston, Mass., for defendant.

## OPINION

GENE CARTER, Chief Judge.

In this civil action brought under 35 U.S.C. § 146, senior party Andrew seeks to overturn the decision of the Board of Patent Appeals and Interferences (the Board) awarding priority of invention in Interference No. 101659 to the junior party, Defendant Gabriel. A trial was held before the Court on June 17 and 18, 1991. As explained by the Board, the interference relates to a horn reflector antenna with an absorber lined conical feed to reduce side lobe levels relative to a main beam. Count two describes the antenna at issue here as follows:

A conical horn-reflector antenna comprising the combination of:

a paraboloidal reflector forming a paraboloidal reflecting surface for transmitting and receiving microwave energy;

a smooth-walled conical feed horn for guiding microwave energy from the focus of said paraboloidal reflecting surface to said reflector, said feed horn comprising a lower conical section adjacent said focus and an upper conical section, said lower conical section having inside walls of a predetermined flare angle; and

a lining of absorber material on at least a portion of the inside walls of said upper section of said feed horn for reducing the side lobes of said microwave energy, said at least a portion of the inside walls of said upper section on which absorber material is located being spaced apart wider than the linear projection toward said reflector of said inside walls of said lower section of said feed horn by an amount at least equal to the thickness of said absorber material thereon.

Andrew filed its Knop application for the invention defined in count 2 on October 17, 1983. Gabriel filed its Allen application on April 2, 1984. The Board held that Gabriel was entitled to priority because it had reduced the subject matter of count 2 to practice in 1982 in an antenna embodying Fig. 1 of the Allen patent application.[1] The Board also held that the embodiment of the Allen Fig. 1 antenna achieved the inventor's purpose.

The parties here have stipulated that Gabriel did indeed build and test one antenna embodying Fig. 1 of the Allen application before the Knop application was filed. Andrew argued before the Board, however, and argues here that the Allen Fig. 1 antenna does not support the count. Andrew also argues, as it did before the Board, that Gabriel's embodiment of the Allen Fig. 1 antenna did not work for its intended purpose and is, therefore, not entitled to priority.

 Andrew suggests that Gabriel has the burden of showing its entitlement to priority. It is true that the junior party has the burden of proof in an interference proceeding to show priority by a preponderance of the evidence. *Morgan v. Hirsch,* 728 F.2d 1449 (Fed.Cir.1984). In a civil action to overturn a decision of the Board, however, the party seeking relief "does not

---

1. Fig. 1 of the Allen application is reproduced in Appendix A.

start over to prosecute his application before the district court unfettered by what happened in the PTO.... [It] has the laboring oar to establish error by the board." *Fregeau v. Mossinghoff*, 776 F.2d 1034, 1038 (Fed.Cir.1985).[2] In reviewing decisions of the Board, district courts are to follow the clearly erroneous standard utilized by appellate courts, adapting the standard to the aspect of the proceeding which allows introduction of additional evidence:

> Thus, even in the absence of additional evidence affecting a particular finding, a finding of fact by the board may be set aside by the district court if clearly erroneous. On the other hand, where new evidence is presented to the district court on a disputed fact question, a *de novo* finding will be necessary to take such evidence into account together with the evidence before the board.

*Id.*

## AMBIGUITY

■ In construing count 2 the Court follows the well-established rule of claim construction ascribed to by both parties in this case:

> In the absence of ambiguity, it is fundamental that the language of a count should be given the broadest interpretation it will reasonably support, and should not be given a contrived, artificial or narrow interpretation which fails to apply the language of the count in its most obvious sense.

*Fontijn v. Okamoto*, 518 F.2d 610, 617 (C.C.P.A.1975). Moreover, limitations not clearly included in a count will not ordinarily be read into it. *Id.* at 618. In *Fontijn* the court explained that an applicant who has selected language that is somewhat broad in scope "runs the risk that others with specifically different structures may be able to meet the language selected, and he will not be allowed to urge later that the language which he has selected should only be read in the light of his disclosure merely because it originated with him." *Id.* at 617 (*quoting Kuppenbender v. Riszdorfer*, 104 F.2d 791, 26 C.C.P.A. 1436 (1939)).

■ The underpinning of Andrew's argument that Allen Fig. 1 does not support the count is that there is an ambiguity in the phrase "lower section" used in the count and that resort must therefore be had to the Knop specification in order to determine the meaning of that term. In determining whether an ambiguity exists, the Court must consider both the wording of the count and the arguments of the parties. *Id.* at 618. It is necessary to remember, however, that broad language in a count is not ambiguous simply because it can be read on more than one embodiment. *Kroekel v. Shah*, 558 F.2d 29, 32 (C.C.P.A.1977). Moreover, to generate an ambiguity a party's argument must be reasonable. *Id.* It may not contradict the express language of the count or conflict with the plain meaning of the words alleged to be ambiguous. *Stansbury v. Bond*, 482 F.2d 968, 975 (C.C.P.A.1973).

The Court finds no ambiguity in the plain language of count 2. Andrew suggests that there is an ambiguity because the count does not expressly define where the "lower section" begins. The Court notes first that the word "lower" has the commonly understood meaning of "below a similar or comparable thing." American Heritage Dictionary, at 745 (2d ed. 1982). In the paragraph of count 2 preceding the one in which "lower section" is used, the invention is described as a conical feed horn "comprising a lower conical section adjacent said focus and an upper conical section, said lower conical section having inside walls of a predetermined flare an-

2. *Fregeau* deals with an action brought under 35 U.S.C. § 145 rather than 35 U.S.C. § 146. The decision is based, however, on the nature of the § 145 action, as one to set aside the Board's decision. It cites *Hoover Co. v. Coe*, 325 U.S. 79, 65 S.Ct. 955, 89 L.Ed. 1488 (1945), which exhaustively analyzed patent legislation and legislative history regarding review and found that while the equitable action to set aside a decision of the Board was originally available only in connection with decisions on priority in an interference, like the one here, it was expanded to include patentability decisions. Since the nature of § 145 and § 146 actions is the same, the *Fregeau* explication of the burdens and standard of review in an action to overturn the board's decision under § 145 is applicable to § 146 actions as well.

gle." It is clear that the purportedly ambiguous "lower section" in the final paragraph refers to the lower conical section adjacent the focus and having a predetermined flare angle. Thus, the count makes plain where the "lower section" is.[3] The Court notes, too, that Andrew's expert Dr. Love apparently agrees that the language of the count is not ambiguous.[4] He testified specifically that "the count is not ambiguous, the ambiguity occurs when you look at figure 1 and try to reconcile it as count 2." Tr. 81–82.

As indicated by Dr. Love's statement, Andrew also argues that the ambiguity of the count is manifested by the arguments of the parties when they try to read count 2 on Fig. 1 of the Allen application. The count says that the absorber-lined walls of the upper section of the horn must be · "spaced apart wider than the linear projection toward said reflector of said inside walls of said lower section of said feed horn by an amount at least equal to the thickness of said absorber material thereon." Andrew argues that the term "lower section" contains a latent ambiguity because Andrew contends that it means the portion of the horn beginning at the bottom of the absorber, including both horn 17 and the portion of the inside walls of section 26 below the absorber, while Gabriel intends "lower section" to mean only 17.[5]

The Court declines Andrew's invitation to find an ambiguity in the term "lower section" based upon the admittedly contradictory arguments of the parties. Dr. Tillman, Gabriel's well-qualified and straightforward expert, testified convincingly that in his opinion there was no ambiguity in reading count 2 on Allen Fig. 1., Tr. 130, and he was readily able to so read it. Tr. 126–130. In his testimony he demonstrated that the section above the flange in Fig. 1

3. The Court has rejected Andrew's argument that the count fails to identify where the "lower section" begins and that it can therefore use the broad interpretation rule to find that "lower section" means any section beginning below the absorber. Premised on this rejected argument, Andrew argues that the count could be read on the prior-art SHX–10A antenna, and therefore that the count was being construed to define an antenna that was not patentable. At trial Dr. Love testified somewhat differently that if he had to adopt what he described as Gabriel's view, he would also find that the SHX–10A satisfies count 2. Tr. 36–7.

The Court notes that it does not find persuasive evidence in the record showing that count 2 can be read on the SHX–10A. Dr. Love offered his opinion that while the SHX–10A does not include a double angle conical structure like the Allen Fig. 1, the curved transition section of the SHX–10A, between the circular wave guide and the wall of the cone, is made up of an infinite number of cones of zero length and infinitesimally small area formed by the tangents to the hyperbolic curve that can be drawn at that point. Tr. 38, 83, 172. The Court finds this interpretation of the SHx–10A far too strained to support the count. The count refers plainly to *an* upper and *a* lower conical section. The possibility of an infinite number of infinitesimally small cones is not what is contemplated by the plain language of the count. On later cross-examination Dr. Love seemed to admit the possibility that the SHX–10A contained only one cone. Tr. 202. Moreover, it is not clear to the Court from the record that these infinitesimally small cones present *one* predetermined flare angle as required by the count.

4. Gabriel moved *in limine* to exclude the testimony of Dr. Love because it was available and had not been presented to the Board. The Court denies the motion, finding that Dr. Love's testimony relates to the specific issues raised before the Board and that it is useful in deciding the issues presented here. *See, Heil Co. v. Snyder Industries, Inc.*, 763 F.Supp. 422, 423–36 (D.Neb.1991).

5. Andrew suggests in its brief that, as regards what Andrew refers to as the common embodiment, Allen Fig. 2 and Knop Figs. 1 and 2, Gabriel has adopted the definition of "lower section" as the portion of the cone below the absorber and that it has changed its definition for use with Allen Fig. 1. The Court finds no such adoption of Andrew's definition. As discussed in the text *supra,* there is a commonly accepted definition of the word lower. As Gabriel has aptly put it in its Reply Memorandum, "[t]he mere fact that the point at which the absorber ends and the upper and lower cones meet is the same in [Allen] Figure 2 does not mean that Gabriel "agrees" that the absorber defines this point." Gabriel Reply Memorandum at 7–8.

The fact that count 2 reads on both the Knop application and Allen's Figures 1 and 2 does not make the count ambiguous. *Kroekel,* 558 F.2d at 32. Since count 2 was broadly drawn, and is to be broadly construed, as the Court pointed out in *Fontijn,* there is always "the risk that others with specifically different structures may be able to meet the language selected." *Fontijn,* 518 F.2d at 617.

is the upper cone, and that the section 17, below the flange and the upper cone, must be the lower cone because it is the only conical section adjacent the focus and having "a", meaning one, predetermined flare angle. Tr. 126–27, 129–130.

Using Andrew's interpretation of "lower section" in Allen Fig. 1 as the portion below the absorber, Dr. Love admitted that the lower section has two distinct flare angles. Tr. 68. Horn 17 has a flare angle of 15¾ degrees and the portion of conical section 26 below the lower edge of the absorber has a flare angle of 16.82 degrees. The construction urged by Andrew, therefore, cannot create an ambiguity because it is "clearly contradictory to the language of the count" and is therefore unreasonable. *Stansbury v. Bond*, 482 F.2d at 975.

█ Dr. Love testified that the "lower section" on Allen Fig. 1 includes not just the cone labelled 17, but everything below the absorber because "that forms the basis for the whole lower feed cone in which the electromagnetic energy extends from wall to wall and is very strong. And that is the only reasonable assumption that an electromagnetic or antenna engineer could make." Tr. 69–70. He further explained that the ambiguity is generated because "[t]here are two ways to interpret this situation … One is a purely geometric way which [Gabriel] has been using. Geometrics is correct as far as it goes but it is not the whole story. You have to look at the situation from an electromagnetic point of view." Tr. 79. In Dr. Love's opinion the Board erred in finding that there was no persuasive reason why the lower conical section should include the whole area below the bottom of the absorber because it had ignored the implications of the electromagnetic field that extends to the bottom of the absorber. Tr. 73.

As discussed above, Dr. Tillman, Gabriel's expert, testified that there was no ambiguity in reading count 2 relative to Fig. 1 of the Allen application. Tr. 130. He explained that count 2 "is talking about a [set]⁶ of geometrical structures, a set of cones." Tr. 130. The Court accepts Dr. Tillman's analysis because it makes sense. Nowhere does count 2 speak of electromagnetic field, it speaks of cones, angles, and linear projections. Any ambiguity in reading count 2 on Fig. 1 is created by Dr. Love's importation of electromagnetic theory into the count. As the court in *Fontijn* stated, however, the language of the count must be applied in its most obvious sense. *Fontijn v. Okamoto*, 518 F.2d at 617. Here the most obvious application is the geometric one described by the plain language and put forth by Dr. Tillman. Moreover, the Court finds no reason that electromagnetic limitations not clearly included in the count should be read into it. *Id.*

Dr. Love believed that count 2 did not read on Allen Fig. 1 because if his definition of lower section was used, the absorber on the walls of the upper cone was not placed on walls spaced wider apart than the projection of the walls of the lower conical section. Tr. 23. When Dr. Love explained his understanding of *Gabriel's* contention that Allen Fig. 1 satisfies the count, it became clear that he was importing into the count electromagnetic requirements that he had drawn from the Allen application:

My understanding of their contention is that by widening the cone out at this point to a larger angle … [t]hat by widening the cone, the upper part of the cone at this point, that they provided clearance for the microwave absorber to be placed in there on those outer walls, and they thought that by doing so it would not obstruct the passage of the electromagnetic wave, in other words, it would avoid blockage. I think I have shown that is not the case, the current is very strong. It's strong in the region of figure 1 below the absorber, the color orange was not used but should have been and for that reason, and I believe that is my understanding of the Allen position.

6. Although the transcript at this point says "center," the Court's notes show that Dr. Tillman said "set", which makes more sense in the context of the sentence.

Tr. 36. Dr. Love had previously testified that he had used the Knop patent application to determine for the Knop embodiment of the count what the upper and lower sections referred to in the count language. Tr. 20. This method of count construction, however, cannot be used to create an ambiguity. As Judge Markey stated in *Kroekel v. Shah,* 558 F.2d at 32:

> Shah's arguments rest entirely on resort to his disclosure. The error here lay in resort to Shah's disclosure for an interpretation of the count language, and in the utilization of that interpretation as a basis for both finding ambiguity and resolving it. Resort to a disclosure has the limited purpose of resolving an ambiguity—not of creating one.

The Court finds, therefore, that count 2 is not ambiguous and that there is no need to resort to the Knop specification to determine the meaning of lower section, as argued by Andrew. It is very clear that "lower section" when read on Allen Fig. 1 means the lower cone 17, which is adjacent the focus, and has a predetermined flare angle. Tr. 126–27. The Court also finds that Allen Fig. 1 meets the other limitations of count 2, for it is a conical horn-reflector antenna, Tr. 126, with a paraboloidal reflector for transmitting and receiving microwave energy, Tr. 126, and a smooth-walled conical feed horn for guiding microwave energy from the focus of the reflector to the reflector. Tr. 126. Allen Fig. 1 also has the above described lower conical section and an upper conical section with absorber material on at least a portion of the walls, Tr. 127, for reducing side lobes. Tr. 34. Also in accordance with count 2 the inside walls of the upper conical section of Allen Fig. 1 are spaced wider apart than the linear projection of the lower horn. Tr. 127.[7]

## REDUCTION TO PRACTICE

■ Andrew also argues that the Board erred in determining that Gabriel had reduced the subject matter of count 2

to practice. The issue of reduction to practice is a question of law, to be reviewed *de novo. DSL Dynamic Sciences Ltd. v. Union Switch & Signal, Inc.,* 928 F.2d 1122, 1125 (Fed.Cir.1991). To show reduction to practice, there is no requirement that an invention establish any degree of perfection or be in a commercially satisfactory stage of development. *Id.* All that is needed is a demonstration of practical efficacy and utility. *Piher, S.A. v. CTS Corp.,* 664 F.2d 122, 127 (7th Cir.1981). Thus, a party must show that "the embodiment relied upon as evidence of priority actually worked for its intended purpose." *DSL,* 928 F.2d at 1125 (*quoting Newkirk v. Lulejian,* 825 F.2d 1581, 1582 (Fed.Cir.1987)). The level of utility required in order to show an actual reduction to practice in an interference proceeding is that "required by the count." *Mattor v. Coolegem,* 530 F.2d 1391, 1395 (C.C.P.A.1976).

■ The structure described in count 2 requires a paraboloidal reflector for the purpose of transmitting and receiving microwave energy, a smooth-walled conical feed horn for guiding microwave energy from the focus of the paraboloidal reflector to the reflector, and a lining of absorber material on part of the upper section for reducing side lobes. The parties have stipulated that prior to October 17, 1983, Gabriel built and successfully tested an antenna corresponding to Allen Fig. 1. The record also shows that that antenna achieved the level of utility set forth in the count. Dr. Love, Andrew's expert, specifically testified that the microwave absorber in Fig. 1 "certainly reduced the side lobes ... as desired." Tr. 34–35.

Referring to the Allen patent application, Dr. Love found the intended purpose of the Allen invention to be the construction of a horn-reflector antenna "which incorporated absorber material in such a way as to reduce the side lobe levels of the antenna in the E-plane, but at the same time did not

---

7. The Court notes that when forced to accept the Gabriel interpretation of the term "lower section," Andrew's expert, Dr. Love, also appeared to be able to read count 2 on Allen Fig. 1. Tr. 69.

incur as much loss [of] [8] gain" as did the original Knop antenna. Tr. 24. The Court finds the record evidence as to Allen's objectives to be immaterial. As the court said in *Mattor:*

> Although the record indicates that Mattor's research was aimed at developing an organic photoconductor superior to the one currently being used, the count does not so require. The count only requires that the formulations, when placed upon a conductive support, produce an electrophotographic element. Therefore, Mattor's standards of success are irrelevant to the issue of reduction to practice. He needed only to recognize and appreciate that he had achieved the level of utility required by the count in order to have had a reduction to practice.

*Mattor v. Coolegem,* 530 F.2d at 1395.

Andrew suggests that Gabriel must prove that the Fig. 1 antenna worked for its intended purpose "even if the 'intended purpose' is not explicitly set forth in the count." [9] Andrew then goes on to urge that Gabriel has not proved its true purpose, as set forth in the Allen application, of "avoid[ing] blocking or shadowing of the reflector by the bottom, path-encroaching edge of the absorber lining." Andrew Post–Trial Memorandum, at 8. The Court disagrees. Even if the Court were required to look at the specification and other record documents to determine the intended purpose of the invention, it is clear that Gabriel has proved that the antenna embodying Allen Fig. 1 accomplishes its intended purpose to the extent required by the law.

As demonstrated above, the evidence shows without a doubt that Gabriel achieved its intended purpose of reducing side lobes. There is a debate about what Gabriel meant by blocking and shadowing the antenna, with Andrew arguing that blocking refers to the blockage by absorber of the energy coming from the bottom of the antenna. At trial Gabriel's witnesses urged that the concept of the antenna was to illuminate the full area of the reflector without any shadowing of the reflector. Tr. 96–97, 157. It is clear from the testimony about blockage from both parties, that no matter how defined, the underlying reason for avoiding blockage is to prevent loss of gain in the antenna. *See* Tr. 25, 74, 154. In the Allen application, the object of the invention is expressly stated as "to provide an improved horn reflector antenna having full aperture gain while reducing low level side lobes by the use of microwave absorber in the conical section of the antenna while minimizing blockage of the passage of microwave energy therethrough." Plaintiff's Ex. 1B, at 5–6. Based on this language it is apparent that in addition to reducing the side lobes Allen had the objective of achieving a satisfactory gain of the antenna or reducing its

---

**8.** The transcript at this point mistakenly says "loss and gain," but the Court's notes reflect that Dr. Love said "loss of gain."

**9.** This principle of law, enunciated vaguely by the Court of Patent Appeals in two older cases relied on by Andrew, *Elmore v. Schmitt,* 278 F.2d 510, 47 C.C.P.A. 958 (1960), and *Burns v. Curtis,* 172 F.2d 588, 36 C.C.P.A. 860 (C.C.P.A. 1949), and reiterated by the Federal Circuit in *DSL,* 928 F.2d at 1125, refers to instances in which the practical use of the device has not been specifically set forth in the count and testing has been conducted without reference to actual working conditions. *Elmore,* 278 F.2d 510 (counter in question tested by itself, apart from any practical device); *see also, Burns v. Curtis,* 172 F.2d 588 (although the counts are not limited to airplane systems, the devices should have been tested for use on airplanes); *DSL,* 928 F.2d at 1125 (where count recites that device is for use with a railway vehicle coupler, and tests were conducted with a caboose, to show reduction to practice party must show that use with a caboose is an intended purpose or if it is not, that the tests with the caboose adequately simulate use for intended purpose.) As the Court explained this requirement in *Elmore,* 278 F.2d 510:

> Schmitt urges that Elmore has not indicated any express requirement of a counter in its ultimate use which was not met by the conditions of Steagall's tests. However, it was incumbent on Schmitt, since he was relying on laboratory tests and seeking an exception to the general rule that tests under actual working conditions are necessary, to show affirmatively that the tests duplicated the essential conditions of some practical use.

The Court is not satisfied that this principle is correctly applied in this case where there is no dispute concerning testing under the conditions of actual intended use.

gain loss in two ways which correspond directly to the parties' conflicting arguments concerning blocking and shadowing of the antenna: 1) provision of an antenna with full aperture gain; and 2) minimizing blockage of the passage of microwave energy.[10]

The record shows that Gabriel achieved full aperture gain with its antenna corresponding to the Allen Fig. 1. The application itself makes clear that although the addition of thicker absorber in antennas provided better radiation patterns, Allen was concerned that *"the effective area of the paraboloidal reflector becomes shadowed* by the presence of the microwave absorber, such that the gain of the antenna is reduced."* Plaintiff's Ex. 1B, at 4 (emphasis added). Dr. Tillman explained that in an aperture antenna you must use the full area of the reflector to get the gain that is expected. "Aperture antennas are designed to try to achieve a certain gain, which means they must be at least of certain size. If you make an antenna that size and don't use all of the area you've got, you won't get your gain." Tr. 154. He further explained: "If you don't use part of the reflector, you need a smaller aperture which reduces the gain.... Well, you don't get any signal on the outer edge of the reflector so it might as well not be there. It simply does not contribute to the gain." Tr. 154.

Dr. Tillman's testimony made clear that Gabriel's antenna design corresponding to Allen Fig. 1 had effectively dealt with the problem of illuminating the full reflector. He stated: "[I]t is evident from the figure, the choice of that 15¾ degree angle [in Allen Fig. 1] is precisely the angle it takes to intercept exactly the reflector and nothing more." Tr. 129. Robert Whiting, a Gabriel executive involved in antenna design testified very credibly that in June of 1982 Gabriel had a theoretical model, which was subsequently built, of an antenna keeping the absorber outside the 15.75 degree angle from the focus to the edges of the reflector which was intended to illumi-

nate the full area of the reflector without any shadowing of the reflector by the absorber. Tr. 96–97. The inventor, Dan Allen, also testified that the Fig. 1 antenna did not block the rays coming from the cone area relative to the area of the reflector. Tr. 161. The Court is satisfied, therefore, that the Gabriel embodiment of the Andrew Fig. 1 antenna met its objective of achieving satisfactory gain by producing an antenna with full aperture gain.

Andrew argues, however, that too much gain loss is incurred in the Fig. 1 antenna because microwave energy propagated in the bottom of the cone is blocked by the absorber which juts out into the cone. With the testimony of Dr. Love, Andrew tried to prove that Gabriel had failed to achieve its objective because the placement of the absorber in the Fig. 1 antenna would result in several types of gain loss: blockage causing reflection of the signal back down the waveguide, taper, defocusing loss, and spillover loss. Tr. 44. Dr. Love explained in response to the Court's questioning that

that gain loss could have been avoided. The gain loss happened because of the blockage created by the fact that the electromagnetic wave suddenly encounters the encroachment of absorber material, and that could have been avoided. So it is not—I think it was too cavalier of the examiners to dismiss that as being unimportant, that loss in gain, it could have been avoided.

Tr. 75. He further testified that while certain gain loss was necessarily to be expected from the addition of absorber, Gabriel did not have to accept as much gain loss as it had. Tr. 191. The Court finds Dr. Love's opinion on this point unpersuasive since he did not make measurements of the losses. Tr. 46.

Gabriel's tests, performed in accordance with industry practice, show that the return loss, or the reflection of the signal back down the reflector was so small it could not be accurately measured. Tr. 103–105. Using the actual horn measure-

---

**10.** The Court is satisfied that these are separate concepts because there would be no need to articulate them separately in the summary of the invention if they were identical.

ments, Professor Tillman calculated that the change in focal point caused by the two flare angles was 1 inch out of every 200 inches. In his opinion this change would not affect the operation of the antenna. Tr. 130–131. Dr. Love's rebuttal of this opinion in terms of wave length displacement at 12 gigahertz, Tr. 164, was too cursory to be persuasive.

This record makes very plain that none of the gain losses suggested by Dr. Love was significant. Dr. Love himself testified that "[a]ll of these effects are small: spillover loss is small, defocus is small, the blockage is not too large either." Tr. 45–46. Dr. Love also made clear if the side lobes are reduced through the introduction of absorber, it is "inexorable" that gain loss will result. Tr. 196. Dr. Tillman too testified that when energy encounters the bottom of the absorber and is reflected back down the horn, the amount lost would be "very small," Tr. 128, that the defocusing caused by the junction of the two flare angles would have almost no effect, Tr. 131–32, and that the spillover loss described by Dr. Love would be "very very negligible." Tr. 133–34. In his detailed description of the invention Allen stated:

> Since a major portion of the power transmitted (and energy received) by the horn 17 is determined by its flare angle to be within the angle of construction lines 24 it is possible to line the space between construction lines 24 and the actual inner surface of the cone 26 with microwave absorber material without *significantly* impeding the flow of microwave energy in either direction, and thus not reducing the transmitting and receiving gain of the antenna as a whole.

Plaintiff's Ex. 1B, at 7–8 (emphasis added). Despite Dr. Love's testimony that the gain loss could have been avoided, the record does not show that the flow of microwave energy was significantly impeded or that any significant gain loss was incurred by the design of the Allen Fig. 1 antenna. Moreover, the testimony of Robert Whiting makes plain that Gabriel had certain specifications for the gain of the antenna and that the tests showed that "[t]he gain was within acceptable limits." Tr. 100.

The law makes clear that for a device to be reduced to practice it need not have achieved perfection or be in a commercially satisfactory stage of development. *Piher, S.A. v. CTS Corp.*, 664 F.2d 122. The tests presented to the Board and the evidence presented to this Court establish beyond cavil that the Gabriel antenna corresponding to Allen Fig. 1 had the requisite practical efficacy. It reduced side lobes, illuminated the full reflector and reduced gain loss caused by blockage at the lower edge of the absorber to levels that were both very small and acceptable to Gabriel. As the Board stated, "[i]t is to be expected that to achieve such a goal [reduction in side lobes] in an antenna by the addition of absorber material, some loss in gain will result due to the addition; engineering improvement normally involves balancing and compromising of performance characteristics." Since Allen Fig. 1 falls within the scope of the count and Gabriel reduced the Allen Fig. 1 antenna to practice before Andrew filed its Knop patent application on October 17, 1983, Gabriel is entitled to a patent with its claims 1–10 corresponding to the count.

Accordingly, it is ordered that Andrew's claim for relief under 35 U.S.C. § 146 be, and it is hereby, DENIED. Judgment shall enter for the junior party Gabriel, entitling it to issuance of a patent.

SO ORDERED.

APPENDIX A